**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-13822

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JORDAN PATRICK LEAHY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cr-00156-KKM-MRM-1

_____

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

ROSENBAUM, Circuit Judge:

Americans ratified the Thirteenth Amendment in 1865. That amendment abolishes all forms of slavery and involuntary servitude within the United States, except as punishment for a crime. U.S. CONST. amend. XIII. But that's not all. Under Section 2 of the

Thirteenth Amendment, we also gave Congress the "power to enforce [the Thirteenth Amendment] by appropriate legislation." *Id.*, § 2. The Supreme Court has consistently recognized that this provision allows Congress to legislate against any activity it "rationally . . . determine[s]" to be a "badge[] or . . . incident[] of slavery." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968).

And Congress used its Section 2 authority to enact 18 U.S.C. § 245 a little over a hundred years after the Nation ratified the Thirteenth Amendment. Section 245 targets racial violence that interferes with federally protected activities. As relevant here, § 245(b)(2)(B) makes it a federal crime for anyone, "by force or threat of force," to "willfully . . . attempt[] to injure, intimidate, or interfere with . . . any person because of his race . . . and because he is . . . enjoying any . . . facility" that a state or local government administers.

A jury convicted Defendant Jordan Leahy of violating this law. The evidence at trial showed that Leahy, a white man, used his car to terrorize a Black family—J.T., his four-year-old daughter, and his girlfriend. Leahy repeatedly tried to run their car off a county road while he yelled racial slurs and made a gun-shooting gesture. When he finally stopped at a red light, Leahy jumped out of his car and went after J.T. on foot. Then, when the police arrived, Leahy told them, "[T]hese guys [Black people] are animals, you know what I'm saying? Y'all have to maintain these people, keep them in their—in their areas."

On appeal, Leahy asks us to strike down § 245(b)(2)(B) as exceeding Congress's power under the Thirteenth Amendment. We won't do that. Section 245(b)(2)(B) falls well within Congress's authority under the Thirteenth Amendment. Leahy also raises other arguments. We find no merit in them, either. The district court committed no error in how it instructed the jury. And the evidence at trial more than sufficiently allowed a reasonable jury to conclude that Leahy willfully attempted to injure, intimidate, and interfere with J.T. and his family because they are Black and used a county road.

So we affirm Leahy's conviction.

## I. BACKGROUND

### A. Factual Background

J.T. is a Black man. On a Sunday night in August 2021, he went to a birthday dinner in Palm Harbor, Florida with his four-year-old daughter and his girlfriend. After dinner, he drove them all southward down County Road 1 ("CR 1") to his girlfriend's apartment in Seminole.

Closer to the apartment, CR 1 turns into Starkey Road. Starkey Road is a public road that Pinellas County, Florida, administers and maintains. Where the incident here occurred, Starkey Road has two lanes traveling in each direction, with about a five-foot-wide, one-foot-tall median. And on that Sunday night at 10:00 p.m., the road was largely empty.

J.T. drove in the left lane heading south.  About a quarter mile past the intersection of Starkey and Ulmerton Roads, he noticed a car come out of a driveaway into the right lane and pull up next to him on his passenger side.  J.T. had never seen this car or the driver, Defendant Jordan Leahy, before.  But J.T. noticed Leahy because Leahy was hanging out his window, yelling and gesturing at J.T.'s car.

J.T. thought the man was pointing to J.T.'s tire and trying to warn him of an impending flat tire.  So J.T. rolled down the front passenger window.  But Leahy wasn't trying to help J.T.  Rather, he was incessantly screaming, "[F]*** you n*****."  When J.T. realized that Leahy was gesturing as if his fingers were a gun shooting at J.T.'s family, J.T. rolled his window back up and tried to ignore this "hateful and angry" man.

But Leahy would not be ignored.  In response to J.T.'s efforts to avoid confrontation, Leahy first used his car to try to push J.T.'s car off the road and into the median.  So J.T. sped up to avoid a collision on his passenger side where his girlfriend and his daughter sat.

Then Leahy moved to the left lane behind J.T.—driving so close to J.T.'s bumper that J.T. couldn't see Leahy's headlights.  J.T. wanted to avoid an impact, which he feared might cause his car to spin out of his control.  So he sped up even more.[1]

---

[1] At this point, Starkey Road moved from two lanes to three lanes to accommodate a left-turning lane.

Undeterred, Leahy again tried to push J.T.'s car into the median. And again, J.T. sped up. But this time, Leahy hit the passenger side of J.T.'s car before speeding away. Both J.T. and his girlfriend felt and heard the crash.

Leahy had escalated the situation so quickly—in about a mile and a half as they drove—that it hadn't occurred to J.T. to call the police. But as Leahy pulled in front as the two cars approached the next traffic light, J.T. drove up close enough to the bumper to try to get a picture of the license plate for a later police report. J.T. thought the episode was over and Leahy would just blow through the light.

But J.T. was wrong. Leahy stopped at the traffic light. So J.T. quickly took a picture of the license plate.

As J.T. snapped the photo, Leahy got out of his car. Based on his many years of training officers in the military and working as a personal trainer and fight coach, J.T. realized that Leahy was coming after him. Concerned for the safety of his daughter and girlfriend, J.T. got out of his car to draw Leahy and any guns he might be carrying away from them. He told his girlfriend to lock the doors and call the police.

The two men walked towards each other. Leahy was yelling, "[F]*** you, n*****" again and again. And when the two got close enough, Leahy started swinging at J.T. J.T. dodged Leahy's hands and hit him twice. Then J.T. subdued Leahy by briefly putting him in a chokehold and holding him on the ground until the police arrived. While on the ground, Leahy, smelling of alcohol, passed out

briefly but woke up to vomit.  J.T. initially refused to let go, so Leahy told him, "[Y]ou got me, my bad, bro, my bad, . . . . I don't want to go to jail."  Then J.T. let Leahy up and held him against Leahy's car until the police arrived.

A witness, Michael Sandbrook, watched J.T. calmly restrain Leahy and asked if J.T. needed any assistance.  Other bystanders were yelling and calling 911, so Sandbrook recorded what was happening on his cell phone.

The police arrived a few minutes later.  They found Leahy drunk, "agitated," and "angry."  Leahy told the police that J.T. had pulled him out of his car and beat him up.  But no physical evidence supported Leahy's story.  And witnesses and other evidence exposed Leahy's lies.

Still, Leahy insisted that J.T. "choked [him] for no reason" and that J.T. "started attacking [him] like some random, like, like criminal . . . You know, negro . . . ."  Leahy told the officers, "[T]hese guys [Black people] are animals, you know what I'm saying?  Y'all have to maintain these people, keep them in their—in their areas."  Leahy even claimed that he was a victim of a hate crime because he is white.  And when it became clear that the officers didn't believe him, he told them, "They're gonna let this monkey f****** beat up on this f****** suburban white kid.  That's crazy.  Man that, what happened to America bro?  Ya'll let the f***** mother f****** from the ghetto beat up on the white suburban kid.  What?  That's crazy."  The officers arrested Leahy at the scene.

At the Florida Highway Patrol office, Leahy complained that the officers were sending a "suburban a**, sheltered a** white kid" to jail to be "[s]urrounded by ghetto a** n******, crack dealers . . . ." And he admitted that he was "[a]lways manipulating s*** . . . doing whatever the f*** [he] want[ed][,] [a]lways act[ing] like the nice a** little white kid[, and] [m]anipulating the f*** outta people."

Leahy's ex-girlfriend, Gabriella Bolt, later testified that Leahy's words and behavior were typical for him. He often spoke to her about wanting to attack Black people—whom he called n******—he saw in public places like the mall and the bus stop.

### B.  Procedural Background

A grand jury in the Middle District of Florida charged Leahy with two counts of interfering with federally protected activities, in violation of 18 U.S.C. § 245(b)(2)(B). Count One alleged that Leahy used force and a dangerous weapon to willfully intimidate and interfere, and attempt to injure, intimidate, and interfere, with J.T. because of his race and because he "was enjoying a facility provided and administered by the State of Florida and its subdivision, that is, Starkey Road." Count Two charged that Leahy used force to willfully attempt to injure, intimidate, and interfere with J.T. for the same two reasons.

Leahy filed two motions to dismiss the indictment. In his first motion, he challenged the constitutionality of 18 U.S.C. § 245(b)(2)(B). Leahy argued that in passing § 245(b)(2)(B), Congress exceeded its authority under the Thirteenth Amendment and

the Commerce Clause. In his second motion to dismiss, Leahy asserted that the indictment alleged a single offense in two counts in violation of the Double Jeopardy Clause of the Fifth Amendment. The district court denied both motions.

Shortly before trial, the Government filed proposed jury instructions. As to the fourth element for both counts, the Government requested the following instruction: "For you to find that the Defendant acted 'because of' J.T.'s use of a public facility, you must find that the Defendant would not have acted as he did, but-for J.T.'s use of that facility."

Leahy objected to this proposed instruction. He asserted that the but-for causation standard is contrary to law. Leahy based his argument on his reading of *United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002). In *Nelson*, Leahy said, the Second Circuit determined that § 245(b)(2)(B)'s constitutionality depends on a specific-intent standard. And Leahy contended that the Government should be judicially estopped from asking for a but-for causation standard because the Government relied on *Nelson* in its opposition to his motion to dismiss the indictment.

Instead of the Government's proposed instruction, Leahy suggested that the district court instruct the jury that the Government needed to prove that he intended to retaliate against J.T. for, or dissuade him from, using Starkey Road. The district court rejected Leahy's arguments and instructed the jury on the but-for causation standard.

22-13822            Opinion of the Court            9

The case proceeded to trial. Prosecutors called 10 witnesses. These witnesses included J.T., his girlfriend, Bolt, Sandbrook, a Pinellas County Public Works employee (to discuss Starkey Road), and five members of law enforcement. Leahy didn't present a defense case.

At the close of the Government's case, Leahy moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. He renewed his argument that the Government needed to prove that he acted with "a specific intent . . . to punish or prevent or dissuade [J.T.] from using" Starkey Road. And in the alternative, he asserted that the Government failed to produce enough evidence for a reasonable jury to conclude that he would not have acted as he did "but for" J.T.'s use of Starkey Road.

The Government opposed Leahy's motion. It directed the district court's attention to *Nelson* and to *United States v. Ebens*, 800 F.2d 1422 (6th Cir. 1986), *overruled in part by Huddelston v. United States*, 485 U.S. 681 (1988), to support the sufficiency of the evidence it had presented. The district court rejected Leahy's motion. Still, the court remarked, "It's not a real, real strong case, but I think it's sufficient to [go to] the jury . . . . I think the Government has put enough out there for the jury to conclude that [J.T.'s use of Starkey Road] . . . was the reason for [Leahy's actions]." The district court found most compelling the Government's evidence that Leahy admitted he "wanted to keep them, referring to [Black people], in their area, which . . . the result of that would be they wouldn't be using Starkey Road."

During the charge conference later that day, the Government asked the district court to instruct the jury that the prosecution needed to prove that J.T.'s use of a public facility—as opposed to his use of Starkey Road in particular—was a but-for cause of Leahy's conduct.  Leahy objected.  He asserted that the Government's proposed instruction would work "a constructive amendment to the indictment."  But before he could explain his objection any further, the district court denied the Government's request.  Although the court agreed with the Government's interpretation, the district court decided to hold the Government to the language in the indictment.  Plus, the court remarked, the Government "adequately" addressed the issue in its rebuttal argument in closing.

For his part, Leahy requested a theory-of-defense instruction focused on the intention to prevent J.T. from using Starkey Road in particular:

> It is the Defense's theory that [Leahy] would have behaved in the same way he did on the night in question even if J.T. had not used Starkey Road.  If you find that the Government has failed to prove beyond a reasonable doubt that [Leahy] acted "because of" J.T.'s use of Starkey Road – that is, that he would not have acted as he did in the absence of J.T.'s use of Starkey Road – then you must find [Leahy] not guilty.

The district court declined.  It saw Leahy's request as an attempt to change its prior ruling rejecting a specific-intent requirement.  And in fact, Leahy conceded that he was still advancing his specific-intent request under the new label.  So the district court remarked that Leahy was "trying to get in through the back door what [he] couldn't get through the front door."  And it reasoned that "putting the label theory of defense in there does not change what the law is and how you define this fourth element."

The next morning, the district court charged the jury.  The court instructed the jury that, to find Leahy acted "because of" J.T.'s use of a public facility, it needed to "find that [Leahy] would not have acted as he did, but-for J.T.'s use of that facility."  The district court further explained, "J.T.'s use of a public facility need not be the only cause for [Leahy's] action.  Thus, you may find this element is satisfied even if [Leahy] had additional reasons for his actions as long as you find that [Leahy] would not have acted as he did in the absence of J.T.'s use of that facility."

The jury deliberated for two days.  During deliberations, the jury asked the district court four questions.  The jury's second note, at 9:17 a.m. on the second day of deliberations, reported, "We are not unanimous on count one.  Do we proceed w[ith] count two?"  The district court answered "yes" and directed the jury to "continue [its] deliberations."

Less than an hour later, the jury submitted a third note.  This note said, "We are not unanimous on neither count one or count two.  Please advise.  Thank you."  In response, and with agreement

from the parties, the district court gave the jury a modified *Allen*[2] charge, directing the jury to continue its deliberations.

Thirty minutes later, the jury asked its final question: "Does the fact that both parties were on road at the same time suffice Part 4 of [the] charges?"  The Government suggested that the district court "just . . . refer them to the jury instructions," and the district court agreed that the question didn't "sound like one [it could] answer."

But Leahy asked the district court to instruct the jury "no." He argued that "the fact that they [were] both on the road" wasn't on its own "sufficient to prove beyond a reasonable doubt element four."  The district court declined to answer the question directly because it interpreted the jury's question as "asking [the court] to answer what they have been asked to answer."  So the district court responded to the jury, "[T]his particular question, as phrased, we cannot answer; however, if you are able to formulate a different or more detailed question on this point, we can take a look at it and see if we can answer that question.  But the one that you have phrased here, we cannot answer."  The jury didn't ask any other questions.

About 30 minutes later, the jury returned its verdict.  It found Leahy guilty as to count one and not guilty as to count two.

Leahy timely filed a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.  He raised three grounds

---

[2] *Allen v. United States*, 164 U.S. 492 (1896).

for this relief: he asserted that (1) the Government "presented no evidence whatsoever that [he] was exclusively seeking out victims on Starkey Road"; (2) the district court didn't instruct the jury on his theory of defense; and (3) the district court "declined to answer the jury's question" even though the jury "proposed a fact pattern" that "was legally insufficient to prove [his] guilt under any competing understanding of the law" and his proposed instruction "would have helped to clear that up." Leahy argued that these alleged errors "[c]onsidered alone or together" merited a new trial.

The district court denied the Rule 33 motion. First, it explained that Leahy's actions and his statements about keeping Black people "in their areas" were sufficient for a reasonable jury to convict him. Second, the court characterized Leahy's theory-of-defense instruction as "inconsistent," "confusing," and "a misstatement of the law." And third, the court reasoned that its response to the fourth jury question "was appropriate" based on "the specific wording" of the question. The district court also denied Leahy's motion for reconsideration of its order denying the Rule 33 motion.

At Leahy's sentencing hearing, the district court sentenced Leahy to 24 months in prison and 36 months of supervised release.

## II. DISCUSSION

Leahy challenges his conviction in three ways. First, he argues Congress's enactment of § 245(b)(2)(B) exceeded its power under the Thirteenth Amendment. Second, he contends the district court abused its discretion when it instructed the jury and declined

to answer the jury's fourth question. And third, Leahy urges that the district court should have granted his motions for judgment of acquittal and a new trial. After careful review of the record and the briefs, and with the benefit of oral argument, we find no error, so we affirm Leahy's conviction. We address each of his arguments in turn.

### A. Section 245(b)(2)(B) is constitutional under the Thirteenth Amendment.

Leahy first asks us to dismiss the indictment against him because he says § 245(b)(2)(B) is an unconstitutional exercise of congressional authority under the Thirteenth Amendment. He challenges the statute both facially and as applied to him.

Ordinarily, we review a district court's denial of a motion to dismiss an indictment for abuse of discretion. *United States v. Focia*, 869 F.3d 1269, 1284 n.9 (11th Cir. 2017) (citing *United States v. Di Pietro*, 615 F.3d 1369, 1370 n.1 (11th Cir. 2010)). But because Leahy's motion challenged the constitutionality of a statute, we review de novo the district court's interpretation of the statute. *Id.* (citing *Di Pietro*, 615 F.3d at 1370 n.1).

A defendant challenging the constitutionality of a statute on its face bears a "heavy burden." *Horton v. City of St. Augustine*, 272 F.3d 1318, 1329 (11th Cir. 2001) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). He must "establish that no set of circumstances exists under which the Act would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *Salerno*, 481 U.S. at 745); *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (explaining that the

22-13822                Opinion of the Court                15

defendant must show that the law "is unconstitutional in all its applications").  To resist this challenge, the Government need show only that the law is constitutional in at least "some of its applications"—for instance, "as applied" to the defendant.  *Rahimi*, 602 U.S. at 693.  Put simply, a facial attack is "the most difficult challenge to mount successfully."  *Horton*, 272 F.3d at 1329 (quoting *Salerno*, 481 U.S. at 745).  And Leahy doesn't do so.

To explain, we start with the text of the Thirteenth Amendment.  The Thirteenth Amendment provides, "Neither slavery nor involuntary servitude, except as a punishment for a crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. CONST. amend. XIII, § 1.  It also grants Congress the "power to enforce [the amendment] by appropriate legislation."  *Id.*, § 2.

The bounds of Congress's authority to enforce the Thirteenth Amendment are well established.  For over fifty years now, when we have addressed challenges to Congress's authority under Section 2 of the Thirteenth Amendment, we have been "guid[ed] by the decision of the United States Supreme Court in *Jones v. [Alfred H.] Mayer Co. . . . .*"  *United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 120 (5th Cir. 1973).[3]

---

[3] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth') as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, [are] binding as precedent in the Eleventh Circuit."  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

In *Jones*, home sellers turned away a Black prospective home buyer "for the sole reason" that the buyer was Black. *Jones*, 392 U.S. at 412. The buyer sued under 42 U.S.C. § 1982. That statute provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." *Id.* (quoting 42 U.S.C. § 1982). The Court concluded that Congress had enacted § 1982 under its "power to enforce [the Thirteenth Amendment] by appropriate legislation." *Id.* at 437–38.

In evaluating the constitutionality of § 1982, the Court explained that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Id.* at 440. Applying this framework, the Supreme Court held that Congress acted constitutionally in exercising its Section 2 authority to ban racial discrimination in the sale of property because Congress rationally determined that this form of discrimination was "a relic of slavery." *Id.* at 440–43. As a result, we have "give[n] great deference, as indeed [we] must, to the congressional determination that [legislation] will effectuate the purpose of the Thirteenth Amendment by aiding in the elimination of the 'badges and incidents of slavery in the United States.'" *Bob Lawrence Realty, Inc.*, 474 F.2d at 120 (quoting *Jones*, 392 U.S. at 439).

The Supreme Court has consistently reaffirmed its decision in *Jones* and its rational-determination framework to govern the use of Congress's Thirteenth Amendment power. *See, e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 179 (1976); *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 172 (1989) (reaffirming *Runyon*); *id.* at 197 (Brennan, J. concurring in part) (explaining that Congress may "identify and legislate against the badges and incidents of slavery").

And so, adopting "the prevailing view among courts," as Leahy describes it, we have repeatedly reaffirmed that *Jones* applies to our review of Thirteenth Amendment legislation. *See NAACP v. Hunt*, 891 F.2d 1555, 1564 (11th Cir. 1990); *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 315 (11th Cir. 1989); *Bob Lawrence Realty, Inc.*, 474 F.2d at 120; *see also, e.g.*, *United States v. Diggins*, 36 F.4th 302 (1st Cir. 2022); *United States v. Roof*, 10 F.4th 314 (4th Cir. 2021).

So as the Supreme Court instructs us to do, we use *Jones*'s framework to assess the constitutionality of § 245(b)(2)(B). As relevant here, § 245(b)(2)(B) makes it a federal crime for any individual to "willfully injure[], intimidate[,] or interfere[] with" another "person because of his race . . . because he is or has been . . . participating in or enjoying any . . . facility . . . provided or administered by any State or subdivision thereof." 18 U.S.C. § 245(b)(2)(B).

Leahy was convicted of violating this law by violently obstructing J.T.'s use of Starkey Road because of J.T.'s race. Under *Jones*, we must consider whether Congress rationally determined

that violent interference with the use of a public road because of race constitutes a badge or incident of slavery.

This is an easy one. We hold that Congress did.

To help assess whether Congress lawfully exercised an enumerated power—namely its authority under Section 2 of the Thirteenth Amendment—we look at the problem congressmembers understood themselves to be confronting when they enacted the challenged law.[4] As the plain text of 18 U.S.C. § 245 reflects, Congressional leaders advocated for § 245 to stop racial violence that intimidated people from using public services. 18 U.S.C. § 245; *see also* S. REP. NO. 90-721, at 3 (1968) (noting Congress's intentions "to deter and punish interference by force or threat of force with activities protected by Federal law or the Constitution and specifically

---

[4] In doing so, we consider any findings or descriptions of the problem in the legislative history, like we do when we evaluate Congress's exercise of its other powers. *Cf. United States v. Lopez*, 514 U.S. 549, 562 (1995) ("[A]s part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings . . . ."); *United States v. Morrison*, 529 U.S. 598, 612 (2000) ("While 'Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce,' the existence of such findings may 'enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye.'" (internal citation omitted) (alterations in original) (quoting *Lopez*, 514 U.S. at 562–63)). They help us discern whether Congress made a "rational determination" in targeting the conduct prohibited under the plain text of the statute as a "badge or incident of slavery." But we are not drawing on this legislative history to interpret the scope of the act itself.

set out in the bill" and "to strengthen the capability of the Federal Government to meet the problem of violent interference, for racial or other discriminatory reasons, with a person's free exercise of civil rights"); H.R. REP. NO. 90-473, at 3 (1968) (same). The law applies to only those activities identified in the statute, including as relevant here, "participating in or enjoying any benefit of . . . facilit[ies]" of state or local governments. 18 U.S.C. § 245(b)(2)(B).

The Senate Committee Report paints the historical picture in 1968, when Congress enacted § 245:

> [A] small minority of lawbreakers has resorted to violence in an effort to bar Negroes from exercising their lawful rights. Brutal crimes have been committed not only against Negroes exercising Federal rights but also against whites who have tried to help Negroes seeking to exercise these rights. Acts of racial terrorism have sometimes gone unpunished and have too often deterred the free exercise of constitutional and statutory rights.

> Such acts of violence have occurred in retaliation against Negroes who have exercised or sought to exercise their civil rights. In some cases, violence has been used against Negroes who have not

20                    Opinion of the Court                    22-13822

> engaged in any civil rights activities in
> order generally to intimidate and deter
> all Negroes in the exercise of their
> rights.   White and Negro civil rights
> workers have also been victimized.

S. REP. NO. 90-721, at 4.  Put succinctly, Black Americans had been deprived of their fundamental rights by widespread violence.

Making matters worse, "[i]n some places, . . . local officials either ha[d] been unable or unwilling to solve and prosecute crimes of racial violence or to obtain convictions in such cases." *Id.*  And that created a "need for Federal action to compensate for the lack of effective prosecution on the local level." *Id.*  In other words, states were allowing a de facto system of racial subjugation to persist.

Violence on public roads, specifically, was a real problem. Just two years before Congress passed § 245, in *United States v. Guest*, 383 U.S. 745 (1966), the federal government indicted a man for shooting a Black man "while he was driving through the State of Georgia." S. REP. NO. 90-721, at 5; *see also* H.R. REP. NO. 90-473, at 4 (discussing *Guest*).  That case raised concerns for deficiencies in existing law, namely the lack of penalties for "private individuals," not state actors, who engage in "racially motivated acts of violence . . . against persons exercising [their] rights."   H.R. REP. NO. 90-473, at 4; *see also* S. REP. NO. 90-721, at 5.

We assess whether Congress's identified conduct—specifically in this case, racial violence interfering with public roads—

rationally qualifies as a "badge or incident of slavery."[5]  This is not a close question.  We are certain that the Framers understood interference with travel on public roads because of race to be a central badge of slavery.

To begin, the slave codes that predated the Thirteenth Amendment uniformly restricted the ability of Black slaves to travel.  Alexander Tsesis, *Enforcement of the Reconstruction Amendments*, 78 WASH. & LEE L. REV. 849, 869–70 & n.112 (2021) (citing KENNETH M. STAMP, THE PECULIAR INSTITUTION: SLAVERY IN THE ANTE-BELLUM SOUTH 192–236 (1956)).  Measures included a pass system to restrict slaves' ability to move about freely.  Justin S. Conroy, *"Show Me Your Papers": Race and Street Encounters*, 19 NAT'L

---

[5] In advancing the bill that would become § 245(b)(2)(B), the relevant congressional committees cited Congress's Article I, Section 8, powers and the Fourteenth and Fifteenth Amendments (but not the Thirteenth Amendment) for Congress's authority to enact the legislation.  *See* S. REP. NO. 90-721, at 6–7; H.R. REP. NO. 90-473, at 4–7.  We don't decide if § 245(b)(2)(B) is a lawful exercise of any of Congress's powers other than Section 2 of the Thirteenth Amendment.  But even if we thought Congress failed to cite the correct authority for this legislation—to be clear, we don't express an opinion on that issue—we can't strike down a law "because Congress used the wrong labels . . . if the Constitution permits Congress to do exactly what" it did.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 569 (2012); *see also Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948) (The "question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.").  And we note that, as a formal matter, Congress didn't expressly rely on any constitutional power in the text of the statute.  *See* 18 U.S.C. § 245; *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (Congress's "authoritative statement is the statutory text, not the legislative history or any other extrinsic material.").

BLACK L.J. 149, 151 (2007) (explaining that "no slaves were to leave their masters' premises at any time unless in company with whites or when wearing servants' livery or carrying written passes") (quoting ULRICH BONNELL PHILLIPS, AMERICAN NEGRO SLAVERY 491 (1918)).

Several states imposed these codes. Virginia's 1680 slave code forbade any "Negro or slave . . . from [leaving] his owner's plantation without certificate and then only on necessary occasions." *Id.* (quoting A. LEON HIGGINBOTHAM, JR., IN THE MATTER OF COLOR: RACE AND THE AMERICAN LEGAL PROCESS 38 (1978) (alteration in original)). In Maryland, a 1676 law prohibited slaves from traveling more than 10 miles from their owners' homes without a written note, and later laws required that free Black Americans bear the burden of proof to show that they weren't slaves and therefore could travel. *Id.* at 153 (citing JEFFREY R. BRACKETT, THE NEGRO IN MARYLAND 37 (1969)). South Carolina enacted a series of laws in 1712 that established a pass system for any slave who sought to go beyond his owner's property. *Id.* at 151–52 (citing HIGGINBOTHAM, IN THE MATTER OF COLOR: RACE AND THE AMERICAN LEGAL PROCESS, *supra*, at 157, 168, 170). We have no trouble concluding that the inability to travel constitutes a badge of slavery.

And this badge of slavery came with considerable violence. South Carolina allowed white captors to "'beat, maim or assault' [their] charge[s] [and] if the slave refused to show his ticket and could not be apprehended alive, he could be killed with impunity." *Id* at 152. (last alteration in original) (quoting HIGGINBOTHAM, IN

THE MATTER OF COLOR: RACE AND THE AMERICAN LEGAL PROCESS, *supra*, at 171).  In Pennsylvania, as early as 1693, any Black person "could be stopped on the street and imprisoned by any magistrate or citizen if the [Black person] did not hold a ticket from his master."  *Id.* at 153 (quoting HIGGINBOTHAM, IN THE MATTER OF COLOR: RACE AND THE AMERICAN LEGAL PROCESS, *supra*, at 307).  A 1725–26 Pennsylvania law empowered white captors to whip Black runaway slaves if they were found more than 10 miles from their owner's home.  *Id.* at 152 & n.19 (citing HIGGINBOTHAM, IN THE MATTER OF COLOR: RACE AND THE AMERICAN LEGAL PROCESS, *supra*, at 287).  And in West Baton Rouge, local ordinances allowed white citizens to arrest Black people on the street and whip any slaves traveling without passes.  *Id.* at 153 (citing PHILLIPS, AMERICAN NEGRO SLAVERY, *supra*, at 498).

The Congress that passed the Thirteenth Amendment understood this form of violence to be at the heart of slavery.  For example, during discussion of the amendment while Congress awaited its ratification, Senator John Sherman highlighted that Section 2 empowered Congress to "secure[] the right of a citizen to travel wherever he chose within the limits of the United States," which states had denied.  CONG. GLOBE, 39th Cong., 1st Sess. 41 (1865) (statement of Sen. Sherman).  And during passage of the Civil Rights Act of 1866, Senator Lyman Trumbull emphasized restrictions on movement as a badge of slavery.  *See* CONG. GLOBE, 39th Cong., 1st Sess. 1759 (noting the need to protect freeman who could be "whipped if caught away from home" under state law).  The 1866 Act dismantled the Black Codes, which enforced badges

and incidents of slavery such as the "control[] [of] the movement of [Black people] by systems of passes . . . ." *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 672 (1987) (Brennan, J., concurring in part & dissenting in part), *superseded on other grounds by* 28 U.S.C. § 1658.

So it's not surprising that all three of our sister circuits that have considered this issue have also found § 245(b)(2)(B) lawful under *Jones*. *See United States v. Allen*, 341 F.3d 870, 883–84 (9th Cir. 2003); *Nelson*, 277 F.3d at 173–91; *United States v. Bledsoe*, 728 F.2d 1094, 1097 (8th Cir. 1984).

In fact, the Supreme Court itself has suggested that violence on public roads is a badge of slavery. For example, in *Griffin v. Breckenridge*, the Court held that Congress could legislate under the Thirteenth Amendment against "conspiratorial, racially discriminatory private action" that blocked travel on interstate highways. *See* 403 U.S. at 105–06.

And contrary to Leahy's suggestion, § 245(b)(2)(B)'s constitutionality does not depend on whether the defendant specifically intended to interfere with the use of a public road. *But see Nelson*, 277 F.3d at 185, 189 (highlighting that § 245(b)(2)(B) construed to have a specific-intent requirement properly targets a badge or incident of slavery because it narrowly targets conduct that involves "two distinct kinds of discriminatory relationships with the victim"). It is enough under the Constitution for a statute to require only "but-for" causation. As the Supreme Court has explained, "whatever else they may have encompassed, the badges and incidents of slavery—its 'burdens and disabilities'—included restraints

22-13822                Opinion of the Court                25

upon 'those fundamental rights which are the essence of civil freedom . . . .'" *Jones*, 392 U.S. at 441 (quoting *Civil Rights Cases*, 109 U.S. at 22). And we must identify only whether Congress rationally prohibited conduct that "herds men . . . and makes their ability to [exercise their rights] turn on the color of their skin." *Id*. at 442–43. When a defendant would not have engaged in violence "but for" his victim's race and use of a public road, he makes his victim's use of that road "turn on the color of their skin."[6]  *See id*.  A law

---

[6] Dismantling slavery that targets Black people sits at the heart of the Thirteenth Amendment. But the amendment does not bar only that form of slavery. *See* AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 359–60 (2005) (highlighting that the Thirteenth Amendment bars "*all* forms of 'slavery [and] involuntary servitude' . . . ."); *compare* U.S. CONST. amend XIII, § 1 (barring all forms of slavery and involuntary servitude, except for as punishments for a crime) *with* amend. XV, § 1 (prohibiting the denial of the right to vote only on the basis of race, color, or previous condition of servitude). The Supreme Court has repeatedly recognized this fact. *See Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 72 (1873) (acknowledging the Thirteenth Amendment prohibits "slavery of the Mexican or Chinese race . . . ."); *Hodges v. United States*, 203 U.S. 1, 16–17 (1906), *overruled on other grounds by Jones*, 392 U.S. at 441 n.78 ("Slavery or involuntary servitude of the Chinese, of the Italian, of the Anglo Saxon, are as much within [the Thirteenth Amendment's] compass as slavery or involuntary servitude of the African."); *United States v. Kozminski*, 487 U.S. 931, 942 (1988) ("The primary purpose of the Amendment was to abolish the institution of African slavery . . . but the Amendment was not limited to that purpose; the phrase 'involuntary servitude' was intended to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." (internal quotation marks and citation omitted)); *see also Nelson*, 277 F.3d at 179 ("[T]here is strong precedent to support the conclusion that the Thirteenth Amendment extends its protections to religions directly, and thus to members of the Jewish religion, without the detour through historically changing conceptions of 'race' . . . ."). So

criminalizing such violence targets a narrow band of conduct that prevents people of an identifiable race from being free rather than "creating a general, undifferentiated federal law of criminal assault . . . ."[7]  *See Nelson*, 277 F.3d at 185, 189.

*Jones* so clearly demands that we uphold § 245(b)(2)(B) that Leahy seeks a way around it.  He spends the bulk of his argument adopting a bold strategy.  Leahy essentially invites us to overrule *Jones* because he says it's inconsistent with other later precedent from the Supreme Court.  *See City of Boerne v. Flores*, 521 U.S. 507 (1997); *Shelby County v. Holder*, 570 U.S. 529 (2013).  Instead, he would have our review of Thirteenth Amendment legislation be guided by the Court's decision in the *Civil Rights Cases*, 109 U.S. 3 (1883).

We decline Leahy's invitation.  As we've already explained, the Supreme Court has remained committed to *Jones*.  *See Runyon*, 427 U.S. at 179; *Griffin*, 403 U.S. at 105; *Patterson*, 491 U.S. at 172.  And in any case, for the purposes of this dispute, the *Civil Rights Cases* and *Jones* reach the same outcome.  In the *Civil Rights Cases*, the Court recognized "restraint of . . . movements except by the

Congress may similarly legislate against the badges and incidents of other forms of slavery that don't specifically target Black people.

[7] Several of our sister circuits have recognized that racially motivated violence alone can be rationally identified as a "badge or incident of slavery"—independent of any use of public facilities. *See, e.g.*, *United States v. Metcalf*, 881 F.3d 641, 645 (8th Cir. 2018) ("[W]e . . . conclude that Congress rationally determined that racially motivated violence constitutes a badge and incident of slavery.").

master's will" to be a badge of slavery. 109 U.S. at 22. So even under the more restrictive test Leahy urges us to adopt, a statute like § 245(b)(2)(B), which prohibits racially motivated violence on the instrumentalities of movement—roads—would still clearly be a lawful exercise of Section 2 authority.

Plus, to the extent the two decisions conflict, in *Jones* itself, the Supreme Court addressed the *Civil Rights Cases*, framed that matter as somewhat consistent with *Jones*, and concluded that any questions about the decision's holding had been "rendered largely academic . . . ." *Jones*, 392 U.S. at 441 n.78. Instead, after *Jones*, the *Civil Rights Cases*'s Thirteenth Amendment analysis stood for only the limited principle that the amendment "authorizes Congress not only to outlaw all forms of slavery and involuntary servitude but also to eradicate the last vestiges and incidents of a society half slave and half free by securing to all citizens, of every race and color, 'the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens.'" *Id.* (quoting *Civil Rights Cases*, 109 U.S. at 22 (Harlan, J., dissenting)). That principle doesn't call into question the constitutionality of § 245(b)(2)(B).

As for the Court's later decisions Leahy claims are inconsistent with *Jones*, *City of Boerne v. Flores* and *Shelby County v. Holder*, for starters, neither applies to Thirteenth Amendment legislation. The Supreme Court has only ever applied the "congruence-and-proportionality" test from *Boerne* to Fourteenth Amendment legislation. *Cf. Allen v. Milligan*, 599 U.S. 1, 41 (2023) (assessing the scope

of Congress's Fifteenth Amendment authority without reference to *Boerne*); *but see id.* at 80 n.19 (Thomas, J., dissenting) ("While our congruence-and-proportionality cases have focused primarily on the Fourteenth Amendment, they make clear that the same principles govern 'Congress' parallel power to enforce the provisions of the Fifteenth Amendment.'") (quoting *Boerne*, 521 U.S. at 518).  And *Shelby County* centered on Fifteenth Amendment legislation.  *See* 570 U.S. 529.

And in any case, even if we agreed with Leahy that the logic of *Jones* has been repudiated by these decisions—we don't—we couldn't overrule the Supreme Court.  We are an inferior tribunal.  And the Supreme Court has explained that even "if a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case, which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *see also Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring) ("[F]ederal courts have a constitutional obligation to follow a precedent of [the Supreme] Court unless and until it is overruled by [the Supreme] Court.").

Simply put, *Jones* binds us, and under *Jones*, we must uphold the exercise of Congress's power under the Thirteenth Amendment if Congress could have rationally determined the conduct it prohibited to be a "badge or incident of slavery."  Legislation to protect all Americans' access, regardless of race, to public roads fits

that bill—especially when, as here, a charged individual engaged in violence to prevent the use of such facilities.

**B. *The district court committed no reversible error in crafting its jury instructions and declining to answer the jury's question.***

Because § 245(b)(2)(B) is constitutional, we turn to Leahy's challenges to the district court's interactions with the jury about that provision. Leahy argues that the district court (1) erred when it refused to instruct the jury that to be convicted under § 245(b)(2)(B), Leahy must have "intend[ed] to deprive a victim of the right to enjoy a public facility or benefit"; (2) in the alternative, abused its discretion by refusing to instruct the jury on Leahy's theory of defense; and (3) abused its discretion by not answering the jury when it asked the court whether "the fact that both parties were on the road at the same time" proves Leahy acted "because of" J.T.'s use of Starkey Road. We address each in turn and hold the district court did not commit reversible error.

1. <u>The district court did not commit reversible error with the instructions it issued to the jury.</u>

Leahy contends the district court abused its discretion when it did not instruct the jury that the Government had to prove that the defendant had "the intent to punish or prevent or dissuade the victim from using the public facility." We disagree.

We review de novo the legal correctness of the district court's jury instructions. *United States v. Seabrooks*, 839 F.3d 1326, 1332 (11th Cir. 2016) (citing *United States v. Prather*, 205 F.3d 1265,

1270 (11th Cir. 2000)).  Our review is for harmless error, so we will vacate the conviction only if "we are left with a substantial and in-eradicable doubt as to whether the jury was properly guided in its deliberations."  *Id.* at 1333 (internal quotation marks omitted) (quoting *United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013)).  "But [w]hen the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury, there is no reason for reversal even though the isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism."  *Id.* (internal quotation marks omitted) (alteration in original).

We start, as we must, by comparing the relevant statute with the district court's instructions.  Section 245(b)(2)(B) mandates that a defendant must have acted "because [his victim] is or has been . . . participating in or enjoying any . . . [state or local public] facility . . . ."  So the district court directed the jury that, to find Leahy guilty, it had to conclude that Leahy would not have acted as he did "but-for J.T.'s use of" a public road (in this case, Starkey Road).  It explained that the jury must find as follows:

> [T]hat the Defendant acted because of J.T.'s use of a facility provided and administered by the State of Florida—in this case, Starkey Road, Pinellas County[,] Florida . . . . For you to find that the Defendant acted "because of" J.T's use of a public facility, you must

find that the Defendant would not have acted as he did but-for J.T.'s use of that facility.  J.T.'s use of a public facility need not be the only cause for the Defendant's action.  Thus, you may find this element is satisfied even if the defendant had additional reasons for his actions so long as you find that the Defendant would not have acted as he did in the absence of J.T.'s use of that facility.

Leahy argues this instruction was faulty because it did not explicitly charge the jury with determining that he acted with "intent" to prevent J.T.'s use of Starkey Road specifically.  The Government responds that it needed to prove only that the defendant acted "but for"—that is, because of—the use of that facility, as the court instructed.  We agree with the Government.

"On a question of statutory interpretation, we begin with the statutory text." *United States v. Doe*, 137 F.4th 1277, 1280 (11th Cir. 2025).  And "[b]ecause the text is unambiguous, we also end our analysis with it." *Id.*  Section 245(b)(2)(B) extends criminal liability where the defendant acted "because" of his victim's use of a public road.

The Supreme Court has recently made clear, interpreting the Civil Rights Act of 1964, that when a statute uses the word "because," it "incorporates the 'simple' and 'traditional' standard of

but-for causation." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346, 360 (2013)); *see also Burrage v. United States*, 571 U.S. 204, 212–13 (2014) (explaining the Supreme Court's "insistence on but-for causality" where "because" is used). "But-for" causation differs from "intent," which is "the mental resolution or determination to do" an act. *Intent*, BLACK'S LAW DICTIONARY (12 ed. 2024). Unlike "intent," "but-for" causation doesn't require a defendant to have been "determin[ed]" to take any action. *See Nelson*, 277 F.3d at 187 (explaining that an intent-based standard encompasses a "narrower" class of conduct than but-for causation). For "but-for causation" to exist, the government need show only that "a particular outcome"—here, Leahy's assault of J.T.—"would not have happened 'but for' the purported cause"— here, J.T.'s use of Starkey Road. *See id.*

The Second Circuit has helpfully explained in the context of § 245(b)(2)(B) the differences between "but-for" causation and an intent-based standard. Adapting that court's explanation for our fact pattern, and reading "because" to mean "but-for" causation in § 245(b)(2)(B), "a racially motivated assault . . . would be covered by the statute if the attacker sought out his victims exclusively [on a public road] (but not if the attacker followed a victim from [his] house and attacked [him] while [he] was [on the public road] only because this happened to be where the first opportunity to assault [him] arose)." *Id.* By contrast, with an intent-based standard, "an attack would not come under the statute even if the attacker only assaulted victims [on the public road], unless the focus on victims

who used the [road] was more than just a matter of convenience. To be covered, the victims' public-[road]-use would *itself* have to be an intrinsic element of the *attacker's* intent . . . , a reason, that is, for the assault." *Id.*

As this example shows, the core difference between "but-for" causation and "intent," as applied to the fact pattern before us, is that an "intent" standard requires the "purpose" or "reason" for conducting the attack to be to stop the use of the road. Under an "intent" standard, the jury must find Leahy acted to prevent J.T. from using Starkey Road to return a guilty verdict.

"But-for" causation, on the other hand, requires only that the attacker wouldn't have attacked if the victim didn't use the road—not that his "reason" was to stop the use of the road. For example, the road could have been a "but-for" cause of the attack because the attacker thinks it's unlikely he'll get caught on the road, so he attacks victims only there. Or the attacker expects to find victims particularly vulnerable on the road, so he targets them there. Another way to look at this is to remove the road from the equation, *see Bostock*, 590 U.S. at 656, and place the victim and the attacker in an entirely different location, like a privately owned supermarket (with no new variables that might motivate an attack). If we ask would the attacker still assault the victim, and the answer is "no," the use of the road was a "but-for" cause.[8]

---

[8] This standard differs from requiring only that to find criminal liability, the attack must have occurred "while" a victim was using a road, as in an earlier draft version of § 245(b)(2)(B). *See Nelson*, 277 F.3d at 187. If the standard were

To be sure, the use of a road can be the "but-for" cause of an attack if the attacker "intended" or had the purpose to stop his victim's use of the road. That is, the attacker wouldn't have attacked without this goal of interfering with the use of the road. In these situations, the distinction collapses, and both "intent" and a "but-for" cause are present. Indeed, the record supports that conclusion here, where Leahy said he acted to "keep" Black people "in their area"—not on Starkey Road. *See* Part II.C., *infra*.

But that's not always the case. And as we've explained, the attacker need not have intended to dissuade use of a road for the use of the road to still be a "but-for" cause. Similarly, almost always, when the road is the "but-for" cause of an attack, the attack will have the *effect* of interfering with the use of the road. But that does not mean that the attacker necessarily acted with the *reason* of interfering with the use of the road.

With this distinction in mind, we conclude that § 245(b)(2)(B)'s text required the Government to show only that Leahy wouldn't have acted "but for" J.T.'s use of a public facility.

---

"while" using a public road—as opposed to "but-for" causation—an attacker would be liable if he would have attacked his victim anywhere in the world but just happened to meet his victim on the road. *See id.* By contrast, under "but-for" causation, the attack must have been dependent on the victim's use of the road. *See id.* That's not to say no other locations, conditions, or factors that would cause the attacker to assault the victim in the absence of the road must exist. *Cf. Bostock*, 590 U.S. at 656 (explaining to discern a "but-for" cause, we "change *one* thing at a time and see if the outcome changes." (emphasis added)). But the particular attack in that moment must have happened as a result of the victim's use of the road.

Congress enacted § 245(b)(2)(B) in 1968, just four years after it passed the Civil Rights Act of 1964.  And we see no reason why the Court would interpret "because" differently in the two statutes. *See Bostock*, 590 U.S. at 656 (interpreting "because of" in Title VII of the Civil Rights Act of 1964).

Given that the word "because" has an ordinary meaning of "but-for" causation, it's no surprise that Leahy concedes that "because" as § 245(b)(2)(B) uses the term elsewhere means "but for." Specifically, § 245(b)(2)(B) requires that the defendant have acted "because of [his victim's] race . . . ."  And both parties agree that *this* use of "because" requires proof of nothing more than "but-for" causation—not intent.  But Leahy asks for a different reading of "because" in separate places of the same statute.

To Leahy, acting "*because* of . . . race" means he would not have acted "but for race," but acting "*because* [his victim] is . . . participating in or enjoying any . . . [state or local public] facility" means acting "with intent to punish or prevent or dissuade" his victim from using a "facility."  We recognize that when a statute uses the same word twice, that phrase typically has the same meaning. *See In re Failla*, 838 F.3d 1170, 1176 (11th Cir. 2016) ("The presumption of consistent usage instructs that '[a] word or phrase is presumed to bear the same meaning throughout a text' . . . ." (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 170 (2012))). So we reject a reading of § 245(b)(2)(B) that tries to give "because" two different meanings in the same subsection.

If Congress had wanted to require the Government to prove intent to interfere with the use of a particular public facility, "it could have easily said so." *Doe*, 137 F.4th at 1281, 1286 (quoting *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 705 (2022)). In other statutes that deploy "because," Congress has "added 'solely' to indicate that actions taken 'because of' the confluence of multiple factors do not violate the law." *Bostock*, 590 U.S. at 656. And it has "written 'primarily because of' to indicate that the prohibited factor had to be the main cause of the defendant's" actions. *See id.* But with § 245(b)(2)(B), Congress used only "because," which signals bare "but-for" causation.

The structure of § 245 further supports this reading of the text. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."). Elsewhere in § 245, Congress expressly conditioned criminal liability on more than "but-for" causation. Other parts of § 245, for instance, prohibit a person from acting "*in order to* intimidate [his victim] . . . from . . . ." engaging in conduct. *See* 18 U.S.C. § 245(b)(1),(4) & (5) (emphasis added). "A material variation in terms suggests a variation in meaning." *In re Failla*, 838 F.3d at 1176 (quoting SCALIA & GARNER, READING LAW, *supra*, at 170); *see also Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1279 (11th Cir. 2006) ("[I]t is generally presumed that Congress acts intentionally and purposely where it includes particular language in one section of a statute but omits it in another." (quoting *Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816, 824

(11th Cir. 1998))).  So we expect the ordinary meaning of "because" to be different from "in order to."

Dictionaries define the phrase "in order to" to mean acting with "the purpose of."  *See Order,* OXFORD ENGLISH DICTIONARY, https://perma.cc/T2B2-WH6S (last accessed Aug. 14, 2025) (defining "in order to" to be "[w]ith infinitive expressing purpose: so as *to* do or achieve (some end or outcome)"); *In order to,* CAMBRIDGE DICTIONARY, https://perma.cc/5SZA-8EPC (last accessed Aug. 14, 2025) ("We use *in order to* with an infinitive form of a verb to express the purpose of something.").  So if Congress had wanted to impose a specific-intent requirement on § 245(b)(2)(B), then it could have used "in order to" as it did elsewhere in the statute.  But Congress chose "because."  And "because" requires only a showing of "but-for" causation.[9]

Leahy doesn't offer persuasive grounds to depart from the ordinary meaning of "because."  He argues that the "but-for" test is unclear when applied to whether a defendant acted "because" of the use of a public facility.  We disagree.  "But-for" causation is straightforward.  As the Supreme Court has explained, "a but-for test directs us to change one thing at a time and see if the outcome

---

[9] We recognize that several of our sister circuits have interpreted § 245(b)(2)(B) to require "intent" to interfere with the use of a public facility.  *See Nelson,* 277 F.3d at 189 & n.24 (collecting cases).  But all these cases long predate the Supreme Court's recent guidance that the ordinary meaning of "because" is "but-for" causation.  *Bostock,* 590 U.S. at 656.  So we respectfully decline to adopt their conclusion.

changes.  If it does, we have found a but-for cause."  *Bostock*, 590 U.S. at 656.

So to sustain a § 245(b)(2)(B) conviction, a jury must assess only whether, if we take away the relevant public facility—if J.T. hadn't used Starkey Road that night—would the defendant still have assaulted him that evening.  If the answer is "no," then the "facility" is a "but-for" cause.  To reiterate, the answer can be "no" for any number of reasons.  But no matter the defendant's "reason" for assaulting his victim, if the answer is "no," the jury should find the defendant acted "because" of the use of a public "facility," as § 245(b)(2)(B) requires.  *See Nelson*, 277 F.3d at 187.  Congress and states have repeatedly used this type of standard to define elements of both criminal and civil statutes.  *See Burrage*, 571 U.S. at 213–14 (collecting cases).

Contrary to Leahy's argument, a specific-intent standard also isn't necessary to "harmonize[] the 'but for' standard with the statute's presumed constitutional purpose."  As we've already explained, § 245(b)(2)(B) is a constitutional exercise of Congress's Thirteenth Amendment authority even under a "but-for" standard.  *See* Part II.A, *supra*.  In short, Congress reasonably determined that not allowing someone to use a public road because they are Black is a "badge or incident of slavery."

At bottom, in this case, § 245(b)(2)(B) called for the jury to evaluate whether Leahy would have attacked J.T. in the "absence" of J.T.'s use of Starkey Road, just as the court instructed the jury. So we conclude the district court appropriately instructed the jury

that to find Leahy guilty, it had to "find that [he] would not have acted as he did but-for J.T.'s use of" Starkey Road.

2. <u>The district court did not abuse its discretion rejecting Leahy's proposed "Theory of Defense" jury instructions.</u>

Next, Leahy argues, in the alternative, that the district court abused its discretion by refusing to instruct the jury on his preferred theory of defense. We hold it did not.

We review for abuse of discretion the district court's decision not to give a proposed jury instruction as to the defendant's theory of defense. *United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008) (citing *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1186 (11th Cir. 2006)). The district court abused its discretion if (1) Leahy's requested instruction correctly stated the law, (2) the instructions the court gave did not substantially cover the subject matter of the requested instruction, and (3) the subject matter of the proposed instruction "dealt with an issue in the trial court that was so important that the failure to give it seriously impaired the defendant's ability to defend himself." *Id.* (quoting *United States v. Paradies*, 98 F.3d 1266, 1287 (11th Cir. 1996)).

To recap, after the district court rejected Leahy's reading of § 245(b)(2)(B), Leahy submitted a proposed instruction entitled, "Theory of Defense."

That proposed instruction would have directed the jury to acquit Leahy if it found that Leahy would have acted the same way had J.T. been on a different road:

It is the Defense's theory that the defendant would have behaved in the same way he did on the night in question even if J.T. had not used Starkey Road. If you find that the Government has failed to prove beyond a reasonable doubt that the defendant acted "because of" J.T.'s use of Starkey Road – that is, that he would not have acted as he did in the absence of J.T.'s use of Starkey Road – then you must find the defendant not guilty.

Leahy admitted these instructions were another attempt to get the court to instruct the jury on a specific-intent standard under a different label. And the district court rejected them as a result. To the extent that Leahy's requested instruction called for specific intent, it was an incorrect statement of the law, so the district court was right to reject it.

Even so, though, the court's adopted instructions closely resembled Leahy's requested instructions. The instructions explained that the jury must acquit Leahy if he "would not have acted as he did in the absence of J.T.'s use of that facility." "That facility," the instruction explained, was Starkey Road.

So Leahy pretty much got what he asked for. And even if § 245 called for specific intent, given the "wide discretion" afforded district courts to phrase their instructions, the court did not abuse

its discretion by refusing to use the specific language Leahy requested. *See Teel v. Lozada*, 99 F.4th 1273, 1279 (11th Cir. 2024). It substantially conveyed Leahy's defense to the jury.

Leahy's contention that the adopted instruction "treats Starkey Road's inclusion in the indictment as surplusage . . . ." and therefore "constitute[s] 'a constructive amendment to the indictment'" fares no better. "A constructive amendment to the indictment occurs where the jury instructions so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the indictment." *United States v. Poarch*, 878 F.2d 1355, 1358 (11th Cir. 1989) (quoting *United States v. Lignarolo*, 770 F.2d 971, 981 n.15 (11th Cir. 1985)).

But the indictment charges Leahy with acting "because J.T. was enjoying a facility provided and administered by the State of Florida and its subdivision, that is, Starkey Road." And the district court's jury instructions closely tracked this language in the indictment. So it's simply inaccurate to suggest that the district court constructively amended the indictment.

For these reasons, we find no reversible error in the district court's refusal to adopt Leahy's "Theory of Defense" instructions.

3. <u>The district court did not abuse its discretion declining to answer the jury's question.</u>

Finally, Leahy challenges the district court's refusal to answer the jury's question. We review the district court's response to a question from the jury for abuse of discretion. *United States v. Wright*, 392 F.3d 1269, 1279 (11th Cir. 2004) (citing *United States v.*

*McDonald*, 935 F.2d 1212, 1222 (11th Cir. 1991)). Our review of supplemental jury instructions considers them "as part of the entire jury charge and in light of the indictment, evidence presented, and arguments of counsel." *United States v. Joyner*, 882 F.3d 1369, 1375 (citing *United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009)).

Leahy argues the district court should have answered "no" when the jury asked whether both parties' presence on Starkey Road was enough to show that Leahy acted "because of" J.T.'s use of Starkey Road. In Leahy's view, the question reflects that the jury didn't understand the causation standard. And Leahy further suggests that was allegedly so because the district court "did not clarify the predicate about what constitutes cause and effect" for "but-for" causation. Relatedly, Leahy asserts that the district court's invitation to the jury to reformulate its question wasn't sufficient because the original question "was so basic to begin with . . . ."

We reject Leahy's arguments. "When a jury requests supplemental instruction, a district court should answer 'within the specific limits of the question presented' and resolve the jury's difficulties 'with concrete accuracy.'" *Joyner*, 882 F.3d at 1375 (quoting *United States v. Baston*, 818 F.3d 651, 661, 663 (11th Cir. 2016)). Although we afford the district court "considerable discretion" in crafting its response, it may not "misstate the law or confuse the jury." *Id.* (citing *Lopez*, 590 F.3d at 1247–48).

Nor may the district court weigh the evidence for the jury. *See Erlinger v. United States*, 602 U.S. 821, 834 (2024) ("Judges may not assume the jury's factfinding function for themselves . . . ."). So

a district court observes best practices by avoiding yes-or-no questions that invite the court to do just that. *See United States v. Walker*, 575 F.2d 209, 214 (9th Cir. 1978) ("Questions or illustrations from the jury may be phrased so that a simple affirmative or negative response might favor one party's position, place undue weight on certain evidence, or indicate that the trial judge believes certain facts to be true when such matters should properly be determined by the jury. Because the jury may not enlist the court as its partner in the factfinding process, the trial judge must proceed circumspectly in responding to inquiries from the jury.").

Here, the district court properly refused to interfere with the jury's role to determine guilt or innocence. The jury asked the district court whether a particular factual finding—that Leahy and J.T. were both on Starkey Road at the same time—was legally sufficient to prove an element of the charges. But the court had already instructed the jury about what it needed to find to return a guilty verdict. And we've explained why those instructions were sufficient.

Plus, the jury's question essentially asked the district court to confirm a factual finding. Not only that, but it did so without providing context as to how a response would have aided the jury's deliberations. So it was reasonable for the court to conclude that the question asked it to do the jury's job and weigh the evidence for it. And the district court did not err by refusing to answer and inviting the jury to present a clearer question.

In fact, had the court suggested what evidence would have sufficed to convict Leahy, it would have erred and exceeded its proper role. *See Walker*, 575 F.2d at 214; *United States v. Rocha*, 916 F.2d 219, 238 (5th Cir. 1990) (assessing whether the district court "improperly commented on the weight of the evidence" when issuing supplemental instructions).

Finally, the jury's conduct after the district court's answer suggests it was not confused on the legal standard. Even though the district court invited the jury to reformulate its question, the jury did not do so. Instead, about 30 minutes later, the jury issued its verdict.

In sum, the district court didn't err when it declined to answer the jury's question.[10]

### C. The district court did not err denying Leahy's motions for judgment of acquittal and a new trial.

Last, Leahy challenges the denial of his motions for judgment of acquittal and a new trial. We review the district court's denial of a motion for a judgment of acquittal de novo. *United States v. Zuniga-Arteaga*, 681 F.3d 1220, 1222–23 (11th Cir. 2012) (citing *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011)). As

---

[10] Leahy, in passing, also contends that "the jury simply issued a split, inconsistent verdict to overcome its deadlock and confusion." But he cites no legal authority for this separate claim, and he develops no argument, so we do not address it. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (collecting cases recognizing when an appellant waives an issue on appeal).

for the denial of a motion for a new trial, we review that for abuse of discretion. *United States v. Green*, 981 F.3d 945, 960 (11th Cir. 2020) (citing *United States v. Hunt*, 526 F.3d 739, 744 n.1 (11th Cir. 2008)).

Leahy argues that insufficient evidence supported his conviction. He again echoes his jury-instruction arguments, contending that no reasonable jury could find he acted "because of" J.T.'s use of Starkey Road. But we have no trouble concluding the government presented enough evidence to support Leahy's conviction.

We review the evidence in the light most favorable to the jury's verdict and accept all reasonable factual inferences to determine whether "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996) (citing *United States v. Keller*, 916 F.2d 628, 632 (11th Cir. 1990); and then citing *United States v. Gafyczk*, 847 F.2d 685, 691–92 (11th Cir. 1988)). And under this standard, we must affirm the conviction "unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015) (internal quotation marks omitted) (quoting *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005)).

The evidence easily allowed a reasonable jury to conclude that Leahy would not have acted "but for" the fact that J.T. is Black and used Starkey Road. First, the evidence showed that Leahy

repeatedly tried to physically run J.T. off Starkey Road while gesturing like he was going to shoot J.T. and incessantly yelling, "[F]*** you n*****."  Second, when Leahy and J.T. got to a traffic light, Leahy got out of his car and went after J.T. on Starkey Road on foot, continuing to yell, "[F]*** you, n*****" at J.T.  Third, Leahy himself explained why he did what he did.  He told the officers, "[T]hese guys [Black people] are animals, you know what I'm saying?  Y'all have to maintain these people, keep them in their—in their areas."  Put simply, Leahy was very transparent about his motivation:  He wanted to keep J.T. off Starkey Road because Starkey Road was outside what Leahy viewed as Black people's "areas."  So a jury could easily conclude that Leahy would not have attacked J.T. if he had not been on Starkey Road and in what Leahy believed to be his "area."

That conclusion becomes even clearer because Leahy repeatedly emphasized that he was a "suburban white kid" and described Black people and specifically J.T. as from the "ghetto."  So the jury reasonably could have inferred that Leahy acted so a Black person would not be in "his" suburbs, including on Starkey Road.

Leahy offers three arguments as to why the evidence here is insufficient: (1) he says he made his incriminating statements only to try "to convince the police falsely that J.T. randomly attacked him"; (2) he wanted the police to "maintain" Black people and didn't say that *he* wanted to keep [B]lack people in their areas"; and (3) the Government didn't present any evidence that he said anything about Starkey Road before, during, or after his

misconduct.  Leahy also notes that the district court stated that this was "not a real, real strong case . . . ."  We are not persuaded.

None of these arguments make the jury's conclusion that Leahy went after J.T. because he is Black and was using Starkey Road any less reasonable based on the record.  And Leahy's implicit suggestion that a guilty verdict required Leahy to mention Starkey Road specifically is a non-starter.  Section 245(b)(2)(B) does not require any magic words.  *Cf. United States v. Price*, 464 F.2d 1217, 1218 (8th Cir. 1972) (upholding § 245 conviction where the defendant argued "the altercation only incidentally occurred on federal property"); *Ebens*, 800 F.2d at 1428–29 (upholding § 245 conviction where the defendant claimed the fight was "simply a barroom brawl which got out of hand and resulted in the death of one of the participants and injuries to another.").  Here, as we've explained, the evidence sufficiently supports the conclusion that Leahy went after J.T. because he was Black and because he was using Starkey Road.

The district court's comment that the Government didn't present "a real, real strong case" also does not help Leahy.  After all, whatever else the district court may have thought about the Government's case, it still determined that enough evidence allowed a jury to return a guilty verdict.  We have explained why that was the right answer based on the evidentiary record here.  So we affirm the denial of Leahy's motions for judgment of acquittal and a new trial.

## III. CONCLUSION

For the foregoing reasons, we affirm Leahy's conviction.

**AFFIRMED.**

22-13822            ROSENBAUM, J., Concurring                    1

ROSENBAUM, Circuit Judge, joined by ABUDU, Circuit Judge, concurring:

In 1820, Congress enacted the Missouri Compromise. Act of March 3, 1820, ch. 19, 3 Stat. 544; Act of March 6, 1820, ch. 22, 3 Stat. 545. That legislation did three major things: It admitted Maine to the Union as a free state; it admitted Missouri as a slave state; and it prohibited slavery above the 36° 30' latitude line in the remaining parts of the Louisiana Territory. Act of March 3, 1820, 3 Stat. at 544; Act of March 6, 1820, 3 Stat. at 545–48.

Thirty-seven years later, in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), the Supreme Court notoriously held that the Missouri Compromise was unconstitutional. There, Dred Scott, an enslaved man, sued for his freedom. *See id.* at 431. His owner had moved him to the free state of Illinois and the free portion of the Louisiana Territory for a total of four years before moving him back to the slave state of Missouri. *Id.* So Scott sought manumission, based on his time in free lands. *See id* at 430.

But the Supreme Court denied him relief. Instead, the Court ruled the Missouri Compromise, which it characterized as an "act of Congress which prohibited a citizen from holding and owning slaves . . . in the territory of the United States . . . ," to be unconstitutional. *Id.* at 452. And the Court went even further. It held that Black people "were not regarded as a portion of the people or citizens of the Government . . . ." and "had no rights which the white man was bound to respect . . . ." *Id.* at 407, 411.

After the Civil War, we abolished slavery with the Thirteenth Amendment and constitutionally corrected that stain on our history. But the Framers of the Thirteenth Amendment went further. Remembering how the Court slashed Congress's authority to eradicate slavery in *Dred Scott*, Americans expressly empowered the legislative branch to pass laws protecting the fundamental rights of newly freed slaves. So under Section 2 of the Thirteenth Amendment, as the Supreme Court articulated in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968), Congress can legislate to prohibit any activity it "rationally . . . determine[s]" to be a "badge[] or . . . incident[] of slavery."

By imbuing Congress with authority to eradicate the vestiges of slavery, we sought to ensure the new freedom would not become "a mere paper guarantee," and slavery would not reemerge under a new name. *See* CONG. GLOBE, 39th Cong., 1st Sess. 1151 (1866) (statement of Rep. Thayer). After all, unfortunately, "the views that motivated *Dred Scott* . . . have not been confined to the past, and we must remain ever vigilant . . . ." *Students for Fair Admissions v. Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 268 (2023) (Thomas, J., concurring).

I wrote the majority opinion, so I'm sure it comes as no surprise that I concur in it in full. As that opinion explains, *Jones* requires us to conclude that § 245(b)(2)(B), under which Leahy was convicted, is constitutional.

So Leahy spends most of his briefing asking us to overrule *Jones* as wrongly decided. That's an action only the Supreme Court

may take. But it's also an action that the history of the Thirteenth Amendment doesn't support. I write separately to explain why.

A review of the history of the Thirteenth Amendment shows that *Jones* is so consistent with the Framers' intentions that the Framers could have authored *Jones* themselves. At the same time, Leahy's proposed alternative is a doctrinal framework that is a relic of Jim Crow, and it would dramatically shrink the authority the Framers gave to Congress in response to *Dred Scott*. *See Civil Rights Cases*, 109 U.S. 3 (1883).

To explain why *Jones* is correct, we must look to the text of and history behind the Thirteenth Amendment. And we must explore why other doctrinal formulations, which Leahy favors, do not capture the original public meaning of the Thirteenth Amendment as well as *Jones*.

My discussion proceeds in four parts. First, I explain how the text of the Thirteenth Amendment supports *Jones*. Second, I show how the decision accurately captures the vision of the Reconstruction Congress. Third, I identify further support for *Jones* in early judicial decisions immediately after the ratification of the Thirteenth Amendment. Finally, I explain why other Supreme Court decisions don't give us cause to doubt the validity of *Jones*.

The Court got it right in *Jones*. We have "no excuse for refusing to apply the original public meaning in the dispute . . . before us." *Fulton v. City of Philadelphia*, 593 U.S. 522, 627 (2021) (Gorsuch, J., concurring).

### I. The text of the Thirteenth Amendment supports *Jones*.

I begin, as we always do when we evaluate the scope of a constitutional provision, with the text. *See United States v. Rahimi*, 602 U.S. 680, 715 (2024) (Kavanaugh, J., concurring) ("The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning as originally understood."). Section 1 of the Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude . . . shall exist within the United States . . . ." U.S. CONST. amend. XII, § 1. Section 2 then grants Congress the "power to enforce [Section 1] by appropriate legislation." *Id.*, § 2

By using the word "appropriate," the Framers conveyed an expansive vision of Congress's power under the amendment. They did not pick the word "appropriate" in a constitutional vacuum. It had a distinct legal meaning traceable to a landmark Supreme Court opinion that Chief Justice John Marshall wrote: *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819).

In *McCulloch*, the Supreme Court crafted a deferential test for courts to apply when assessing the scope of Congress's power. The Court considered whether Congress could create a national bank under its Article I, Section 8, powers, including its authority to "make all Laws which shall be necessary and proper for carrying into Execution [its] powers . . . ." U.S. CONST. art. I, § 8, cl. 18; *McCulloch*, 17 U.S. at 401. Maryland argued for a restricted reading of "necessary and proper." Under Maryland's preferred test,

Congress could pass only those laws that were "indispensable" to its duties. *McCulloch*, 17 U.S. at 413. But the Court rejected this limited reading. *Id.*

Instead, in the most famous passage of the opinion, the Court wrote, "Let the end be legitimate, let it be within the scope of the constitution, and all means which are *appropriate*, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Id.* at 421 (emphasis added). Or in other words, so long as Congress's goal was constitutional, the Court would uphold any law legitimately designed to accomplish Congress's goal that the Constitution didn't otherwise prohibit.[1] In effect, "appropriate legislation" was almost any legislation that could be rationally understood to enforce other constitutional provisions.

Applying this test, the Supreme Court was extremely deferential to legislation that the pre-Civil War Congresses passed. In fact, in only one case did the antebellum Supreme Court invalidate an act of Congress after *McCulloch*. *See United States v. Rhodes*, 27 F. Cas. 785, 793 (C.C.D. Ky. 1866); Akhil Reed Amar, America's Constitution: A Biography 362 (2005). That case was *Dred Scott*, in which the Court infamously held that Congress couldn't ban

---

[1] These external constitutional constraints could come from anywhere else in the Constitution. For example, a bill of attainder or an ex post facto law couldn't be "appropriate legislation" because it would violate Article I, Section 9, Clause 3. Similarly, Congress couldn't expand the scope of the Supreme Court's original jurisdiction because doing so would violate Article III, Section 2, Clause 2. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

6                    ROSENBAUM, J., Concurring                    22-13822

slavery in the territories and Black people couldn't be citizens. *Rhodes*, 27 F. Cas. at 793; AMAR, AMERICA'S CONSTITUTION, *supra*, at 362. But the Reconstruction Amendments are widely understood to have repudiated that decision. *See* AMAR, AMERICA'S CONSTITUTION, *supra*, at 380.

The Framers of those amendments knew that "appropriate" meant a large grant of authority to Congress. Notably, they paid attention to how the *McCulloch* test saw the antebellum Court reflexively uphold pro-slavery legislation. *Id.* at 362.

The most notorious example was *Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 539 (1842). *See* AMAR, AMERICA'S CONSTITUTION, *supra*, at 362. In that case, the Supreme Court upheld federal legislation to facilitate the return of fugitive slaves to the South. *See Prigg*, 41 U.S. at 615–22. Before the enactment of the Thirteenth Amendment, which effectively nullified it, the Fugitive Slave Clause required states to return any enslaved people to their slaveowner if he claimed them. U.S. CONST. art. IV, § 2, cl. 3. Located in a part of the Constitution governing the conduct of states, the Clause says nothing of Congress's role to enforce it. *Id.* But the *Prigg* Court held that "the national government is clothed with the *appropriate* authority and functions to enforce it." *Prigg*, 41 U.S. at 615 (emphasis added). The Reconstruction amendment Framers, citing *Prigg*, "relished the irony that [the word 'appropriate'], which had long been used to support proslavery congressional laws . . . would henceforth authorize a wide assortment of

22-13822          ROSENBAUM, J., Concurring                    7

antislavery congressional laws." AMAR, AMERICA'S CONSTITUTION, *supra*, at 362.

The *Jones* Court recognized the centrality of *McCulloch* to the language of the Thirteenth Amendment. It explained that the Section 2 power to enact "appropriate legislation" "clothed 'Congress with power to pass *all laws necessary and proper for abolishing all badges and incidents of slavery in the United States*.'" *Jones*, 392 U.S. at 439 (quoting *Civil Rights Cases*, 109 U.S. at 20) (emphasis in original). Therefore, Congress could do "much more" than enforce the minimum guarantees of the amendment. *Id.* And the Court ended *Jones* quoting a floor manager for the Civil Rights Act of 1866 ("1866 Act"), enacted using Section 2 authority, who defended the constitutionality of the bill by "recall[ing] the celebrated words of Chief Justice Marshall in *McCulloch*[.]" *Id.* at 443.

Put simply, the Court crafted the *Jones* test to be a more specific application of *McCulloch* for the Thirteenth Amendment. Under the *Jones* test, we uphold a statute if Congress rationally determined the conduct it targeted to be a badge or incident of slavery. *Id.* at 440–41. The "end" of all such legislation is necessarily "legitimate": eliminating the vestiges of slavery. *See id.* at 443–44 (quoting CONG. GLOBE, 39th Cong., 1st Sess. 1118 (statement of Rep. Wilson)). And that "end . . . is defined by the Constitution itself." *See id.* at 443. So *McCulloch* instructs us to defer to "appropriate" means "plainly adapted to that end." *See McCulloch*, 17 U.S. at 421. That is, we defer to Congress's rational determination that a law targets a "badge or incident of slavery."

**II. The history of the Reconstruction Congress supports**
   ***Jones.***

The history behind the passage, ratification, and early implementation of the Thirteenth Amendment also strongly supports *Jones*. As I will discuss, the Framers of the amendment envisioned Congress at center stage enacting legislation it deemed "appropriate" to eliminate slavery. These statutes could reach even beyond the baseline judicially enforceable guarantees of the amendment. To explain Congress's vision, we must walk through the birth of the Thirteenth Amendment to the first landmark piece of legislation enacted under its authority to even the emergence of the Fourteenth Amendment.

The text of the Thirteenth Amendment was Senator Lyman Trumbull's brainchild. In March 1864, as Chair of the Senate Judiciary Committee, he reported out of Committee the language that was adopted and ratified. James Gray Pope, *Mass Incarceration, Convict Leasing, and the Thirteenth Amendment: A Revisionist View*, 94 N.Y.U.L. REV. 1465, 1474 (2019) (citing CONG. GLOBE, 38th Cong., 1st Sess. 1313 (1864) (statement of Sen. Trumbull)).

This new Thirteenth Amendment was a radical proposal. Previous plans for the abolition of slavery, including President Lincoln's proposal, called for a gradual phaseout of the institution. *See* AMAR, AMERICA'S CONSTITUTION, *supra*, at 353–58. They also included payment to slaveowners for their freed slaves. *See id.* at 357. By contrast, Trumbull's ratified proposal meant the immediate and uncompensated emancipation of all slaves overnight. *See id.* at 360.

22-13822                ROSENBAUM, J., Concurring                9

And under it, Congress would have authority to enact "appropriate legislation"—any law that would survive the *McCulloch* test—to facilitate such a sweeping change.  U.S. CONST. amend. XIII.

Trumbull's proposal made Congress think about what it would mean to end slavery.  For years before the Thirteenth Amendment, Americans defined "slavery" to mean much more than merely a system where one human held another formally as property.  Instead, Americans understood slavery to be a broader institution—one that contained many "badges and incidents"—smaller denials of rights—that cumulatively contributed to a group of people being unfree.  *See* AMAR, AMERICA'S CONSTITUTION, *supra*, at 362.

Representative William Holman of Indiana pointedly summarized the importance of addressing "badges and incidents" to uproot slavery.  He said that the "[m]ere exemption from servitude is a miserable idea of freedom.  A pariah in the state, a subject but not a citizen, holding any right at the will of the governing power.  What is this but slavery?"  CONG. GLOBE, 38th Cong., 1st Sess. 2962 (statement of Rep. Holman).  So because Congress had the authority to enact "appropriate legislation" to end slavery, it could enact legislation to end these "badges and incidents."  AMAR, AMERICA'S CONSTITUTION, *supra*, at 362.

These "badges and incidents of slavery" that fell under the Thirteenth Amendment's prohibition were vast.  At a minimum, the Reconstruction Congress agreed that the Thirteenth Amendment conferred certain "'civil' rights[,] includ[ing] the right to

make and enforce contracts; and the right to be full parties and witnesses in court proceedings . . . ." *See* William M. Carter Jr., *Race, Rights, and the Thirteenth Amendment: Defining the Badges and Incidents of Slavery*, 40 U.C. Davis L. Rev. 1311, 1324 n.33; *see id.* at 1324 n.34 (quoting ALEXANDER TSESIS, THE THIRTEENTH AMENDMENT AND AMERICAN FREEDOM: A LEGAL HISTORY 45 (2004)) (noting that Representative Martin Thayer spotlighted "the rights to enforce contracts, sue, give evidence in court, inherit and purchase, lease, hold, and convey real property."); *cf.* Melissa L. Saunders, *Equal Protection, Class Legislation, and Colorblindness*, 96 MICH. L. REV. 245, 270 & n.105 (1997) (highlighting that even more moderate Reconstruction Republicans intended to protect the "civil rights" of newly emancipated slaves "includ[ing] the right to make and enforce contracts; to buy, lease, inherit, hold, and convey property; and to sue, be sued, and give evidence in court"); Jacobus tenBroek, *Thirteenth Amendment to the Constitution of the United States: Consummation to Abolition and Key to the Fourteenth Amendment*, 39 CAL. L. REV. 171, 190–200 (1951) (describing Reconstruction Republicans' belief that the Thirteenth Amendment empowered and conferred a duty on them to protect the civil rights of emancipated slaves).

And many congressmen described these "badges and incidents" in greater detail. Carter, *Race, Rights, and the Thirteenth Amendment*, *supra*, at 1324–25 & nn. 33 & 34. For example, Senator James Harlan suggested the amendment extended to "the lack of respect for familial bonds, inability to hold property, denial of equal status before the justice system, suppression of freedom of speech, and prohibition on black[] [Americans'] ability to seek education."

*Id*. at 1324–25 n.34. And Representative John Kasson discussed "the right to conjugal relations, parental rights, and the right of a man to the personal liberty." *Id*. (quoting TSESIS, THE THIRTEENTH AMENDMENT AND AMERICAN FREEDOM, *supra*, at 46 (2004)) (internal quotation marks omitted). The Thirteenth Amendment doesn't expressly mention these rights, which sat at the outer bounds of the system of slavery. But that Amendment gave Congress the authority to enact "appropriate legislation" to end slavery. So Congress could address even these more peripheral denials of freedom. *See* AMAR, AMERICA'S CONSTITUTION, *supra*, at 362.

Even opponents of the Thirteenth Amendment recognized this fact. They warned the Thirteenth Amendment "would give Congress virtually unlimited power to enact laws for the protection of [Black Americans] in every State." *Jones*, 392 U.S. at 439 & n. 76 (collecting primary sources).

The Reconstruction Congress quickly put this new authority to the test. Within six months of the ratification of the amendment, Congress passed the Civil Rights Act of 1866. Douglas L. Colbert, *Liberating the Thirteenth Amendment*, 30 HARV. C.R.-C.L.L. REV. 1, 11 (1995); Civil Rights Act of 1866, ch. 31, 14 Stat. 27, 27–30 (1866). Relying on its Section 2 authority, Congress guaranteed several civil rights to eliminate what it believed to be "badges and incidents of slavery." Civil Rights Act of 1866, 14 Stat. at 27–30; tenBroek, *Thirteenth Amendment*, *supra*, at 190–200 (1951). These rights included entitlement "to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold,

and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens." *Jones*, 392 U.S. at 422 (quoting Civil Rights Act of 1866, 14 Stat. at 27).

The statute, and the debate surrounding it, reflected what the Reconstruction Era Framers thought to be the scope of Congress's Section 2 authority. And the *Jones* Court, in reaching its decision, paid particular attention to this historical episode to craft a framework faithful to its lessons. *See id.* at 439–44.

The 1866 Act primarily aimed to grant citizenship to all people born on American soil who were not subject to a foreign power. *See* Civil Rights Act of 1866, 14 Stat. at 27. It represented a swift congressional response to both state persecution, in the form of the Black Codes, and private violence against newly freed slaves. Douglas L. Colbert, *Liberating the Thirteenth Amendment*, *supra*, at 11–15 (1995). Congressman Martin Thayer described the sentiment in Congress succinctly. He said, "[W]hen I voted for the amendment to abolish slavery . . . I did not suppose that I was offering [African Americans] . . . a mere paper guarantee. And when I voted for the second section of the amendment, I felt . . . certain that I had . . . given to Congress ability to protect . . . the rights which the first section gave . . . ." *Jones*, 392 U.S. at 433–34 (quoting CONG. GLOBE, 39th Cong., 1st Sess. 1151 (1866) (statement of Rep. Thayer)).

The most thorough articulation of Congress's authority under the Thirteenth Amendment came from Senator Trumbull, the

man who introduced the words that became the amendment itself. As *Jones* discusses extensively, Trumbull gave a speech on the floor of the Senate defending Congress's authority to pass the Civil Rights Act. *See id.* at 440 (quoting CONG. GLOBE, 39th Cong., 1st Sess. 322 (1866) (statement of Sen. Trumbull)).

He began by referencing the state-sponsored violent back-lash to the Thirteenth Amendment. *Id.* Trumbull proclaimed to his colleagues, "[T]he trumpet of freedom that we have been blow-ing throughout the land has given an 'uncertain sound,' and the promised freedom is a delusion." *Id.* With these words, Trumbull led the way for Congress to use its broad Section 2 authority to enshrine more extensive civil-rights protections for the newly freed slaves.

Section 2, Trumbull reasoned, allowed Congress to "de-stroy all these discriminations in civil rights against the black man . . . ." *Id.* He explained that "if [Congress] cannot" address widespread racial discrimination under Section 2, "our constitu-tional amendment amounts to nothing." *Id.* In fact, he said the country adopted Section 2 for the "purpose" of giving Congress the power to eliminate racial discrimination if it so chose. *Id.*

Then Trumbull highlighted from the text of Section 2 that "Congress shall have authority, by appropriate legislation, to carry into effect the article prohibiting slavery." *Id.* With that, Trumbull laid out the Framers' vision for the scope of Section 2. Echoing the expansive *McCulloch* standard, he asked, "Who is to decide what that appropriate legislation is to be?" And he answered, "The

*Congress* of the United States; and it is for *Congress* to adopt such appropriate legislation as it may think proper, so that it be a means to accomplish the end." *Id.* (emphasis added).

This speech was the central inspiration behind the *Jones* test. The Court quoted this speech at length and then concluded that Senator Trumbull's understanding of the Thirteenth Amendment was the correct one:

> Surely Senator Trumbull was right. Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation.

*Id.* at 440-41. In short, the Court had Trumbull's vision top of mind when it designed the *Jones* test.

But Trumbull wasn't alone in his vision. As we've discussed, Representative Wilson, a floor manager for the Civil Rights Act of 1866, explained how the *McCulloch* standard authorized the statute under the Thirteenth Amendment. *See id.* at 443. And Senator Jacob Howard, a member of the Senate Judiciary Committee when the Thirteenth Amendment was proposed, whistled the same tune in the Senate. *See* CONG. GLOBE, 39th Cong., 1st Sess. 503–04 (1866) (statement of Sen. Howard). Indeed, the *Jones* Court also cited this speech. *See Jones*, 392 U.S. at 440 n.77.

Howard's speech further shows that the Thirteenth Amendment gave Congress wide discretion to eradicate the "badges and incidents of slavery." As Howard explained things, the Framers expected state governments to use "all the[ir] powers . . . in restraining and circumscribing the rights and privileges" of recently freed slaves. CONG. GLOBE, 39th Cong., 1st Sess. 503 (1866) (statement of Sen. Howard). Among these rights were "earning and purchasing property; . . . having a home . . . having a wife and family, [and] . . . eating the bread he earns . . . ." *Id.* at 504. This is why, Howard explained, the Thirteenth Amendment prohibited an expansive scope of "badges and incidents of slavery" beyond mere formal abolition. And the amendment empowered Congress to "look after [freed slaves'] well-being" to prevent a "mockery of emancipation." *Id.* at 503. So the 1866 Act was constitutional. *Id.* at 504.

Even so, not all in Washington were receptive to Trumbull and Howard's view. Fiercely resistant to Reconstruction, Democrats in Congress rebuked the Framers' expansive vision of the Thirteenth Amendment's authority. *See Jones*, 392 U.S. at 439 n.75 (collecting statements). Many opponents of the bill cited the Supreme Court's pre-Civil War decision in *Dred Scott* that free Black people could not be citizens. Rebecca E. Zietlow, *Congressional Enforcement of Civil Rights and John Bingham's Theory of Citizenship*, 36 AKRON L. REV. 717, 732 (2003).

But their views offer little insight into the public's true understanding of the amendment. After all, only months before, they

argued that the Thirteenth Amendment should not be ratified because it reached all sorts of discrimination that Black Americans faced. *See Jones*, 392 U.S. at 439 n.76 (collecting statements). Then, with the adoption of the amendment and the passing of the 1866 Act, they suddenly developed a new restricted reading of the text to defeat the Act.

Still, in President Johnson, these Reconstruction opponents had an ally. President Johnson opposed the bill that became the 1866 Act, decrying it as unconstitutional. But he also held racist personal beliefs that certain groups should not have citizenship. So he vetoed the act on both grounds. *See* CONG. GLOBE, 39th Cong., 1st Sess. 1679–81 (1866) (message of Pres. Johnson).

In his veto message, Johnson criticized Congress for granting citizenship to "the Chinese of the Pacific States, Indians subject to taxation, the people called Gypsies, as well as the entire race designated as blacks, people of color, negroes, mulattoes, and persons of African blood." *Id.* at 1679. He questioned whether it can "be reasonably supposed that [freed slaves] possess[ed] the requisite qualifications to entitle them to all the privileges and immunities of citizens of the United States[.]" *Id.* And he complained that "a perfect equality of the white and black races is attempted to be fixed by Federal law, in every State of the Union, over the vast field of State jurisdiction covered by these enumerated rights." *Id.* at 1679–80. In his view, the bill was "another step, or rather stride, toward centralization and the concentration of all legislative

22-13822          ROSENBAUM, J., Concurring          17

powers in the national Government." *Id.* at 1681.  And he thought the Thirteenth Amendment couldn't justify it.  *Id.*

At bottom, by 1866, four months after the ratification of the Thirteenth Amendment, President Johnson saw Section 2 as virtually a dead letter.  *See id.*  In his view, "[s]lavery ha[d] been abolished," and only if an attempt to revive it occurred would it be "the duty of the General Government to exercise any and all incidental powers necessary and proper to maintain inviolate this great constitutional law of freedom."  *Id.*

But it was President Johnson's message that turned out to be the dead letter.  Congress resoundingly rejected his critiques.  And for the first time in American history, it overrode the President's veto on a major piece of legislation—the 1866 Act.  AMAR, AMERICA'S CONSTITUTION, *supra*, at 362.  The vote was not close.[2]  So the Act became law.  Faced with Johnson's restricted reading and Trumbull's authoritative vision, Congress resoundingly sided with Trumbull.  We should not abandon *Jones* in favor of a framework that better aligns with the views of Johnson and the 1866 Democrats.

To be sure, a minority of lawmakers continued to argue that the Civil Rights Act of 1866 was unconstitutional, including a tiny subset of Republicans.  Most notable among them was John

---

[2] The Senate voted to override President Johnson's veto by a vote of 33 to 15 with 1 absent just 10 days after the President returned the bill.  CONG. GLOBE, 39th Cong., 1st Sess. 1809 (1866).  The House followed suit three days later by a vote of 122 to 41 with 21 abstaining.  *Id.* at 1861.

18                  ROSENBAUM, J., Concurring                  22-13822

Bingham, the father of Section 1 of the Fourteenth Amendment. Zietlow, *Congressional Enforcement*, *supra*, at 735.

But Bingham's view is relevant to the interpretation of the *Thirteenth Amendment* only to the same extent as any member of the public in 1865. He was not in Congress when Congress proposed and passed the Act.[3] Still, he believed in Trumbull's goals for the Civil Rights Act, namely that the Federal Bill of Rights would be enforced "everywhere."[4] *Id.* So when the Fourteenth Amendment was proposed, he and his allies in Congress took the opportunity to shore up doubts about Congress's authority under the Thirteenth Amendment to enact the 1866 Act. *Id.* And because the history and text of the Fourteenth Amendment provide nearly contemporaneous evidence that the Thirteenth Amendment widely empowers Congress to enact legislation addressing what it rationally determines to be the "badges and incidents of slavery," I take a moment to review that history and text.

Of course, today, the Fourteenth Amendment begins with the clause that "[a]ll persons born or naturalized in the United

---

[3] Bingham lost reelection in the midterm election of 1862. Richard L. Aynes, *The Antislavery and Abolitionist Background of John A. Bingham*, 37 CATH. U. L. REV. 881, 930 (1988). So he was not a member of the 38th Congress, which passed the Thirteenth Amendment on January 31, 1865. *See* CONG. GLOBE, 38th Cong., 2nd Sess. 531 (1865). He returned to office in March 1865, after he was reelected to the 39th Congress. *See* Aynes, *The Antislavery and Abolitionist Background of John A. Bingham*, *supra*, at 930 n.393.

[4] Bingham ultimately abstained from the vote on the 1866 Act. *See* CONG. GLOBE, 39th Cong., 1st Sess. 1861 (1866)

22-13822         ROSENBAUM, J., Concurring         19

States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. CONST. amend. XIV, § 1. Senator Howard introduced this Citizenship Clause. And he described it "as largely 'declaratory' of existing law, including the 1866 Act." *United States v. Vaello Madero*, 596 U.S. 159, 175 (2022) (Thomas, J., concurring) (citing CONG. GLOBE, 39th Cong., 1st Sess. 2890 (statement of Sen. Howard)). But its inclusion also "forever closed the door on *Dred Scott*" and "constitutionalized the Civil Rights Act of 1866." *Id.* (citation omitted).

Congress paired the Citizenship Clause with Section 5 of the Fourteenth Amendment, which provides that "Congress shall have power to enforce, by appropriate legislation" the amendment. U.S. CONST. amend. XIV, § 5. By writing Section 5 of the Fourteenth Amendment to include nearly identical language to that of Section 2 of the Thirteenth Amendment, Congress intended to give itself the same sweeping authority to enforce the Citizenship Clause as it gave itself to enforce the Thirteenth Amendment. AMAR, AMERICA'S CONSTITUTION, *supra*, at 363; *see also* Steven A. Engel, Note, *The McCulloch Theory of the Fourteenth Amendment:* City of Boerne v. Flores *and the Original Understanding of Section 5*, 109 YALE L.J. 115 (1999). Plus, in debates over the Fourteenth Amendment, Republicans repeatedly invoked *McCulloch* and *Prigg*, hammering home that the Supreme Court's doctrine, after which they modeled Section 5, promised broad judicial deference to Congress's exercise of its powers. AMAR, AMERICA'S CONSTITUTION, *supra*, at 363.

And once more, the American people ratified the Reconstruction Congress's proposal. So in effect, for the few who read the Thirteenth Amendment narrowly, the Fourteenth Amendment constitutionalized Trumbull's vision for congressional power to eradicate the "badges and incidents of slavery." *See id.* The public twice affirmed Trumbull's vision, and in doing so, twice approved of the framework *Jones* adopted. That is, Congress has the authority "rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Jones*, 392 U.S. at 440.

In sum, then, the Reconstruction Congress that passed the Thirteenth Amendment understood its authority under Section 2 to be broad. So did the immediately succeeding Congress, which passed the Civil Rights Act of 1866 and the Fourteenth Amendment. And the *Jones* framework accurately encapsulates the Framers' vision of judicial deference to Congress's rational Thirteenth Amendment legislation.

### III. Judicial decisions immediately after the ratification of the Thirteenth Amendment confirm the correctness of *Jones*.

The fight over the constitutionality of the Civil Rights Act of 1866 did not end with its passage. Immediately after the bill became law, legal challenges emerged contesting its constitutionality. *See, e.g.*, *Rhodes*, 27 F. Cas. at 785; *In re Turner*, 24 F. Cas. 337 (C.C.D. Md. 1867). Two Justices riding circuit opined on the scope of

22-13822          ROSENBAUM, J., Concurring          21

Congress's Section 2 authority.  *See Rhodes*, 27 F. Cas at 785; *In re Turner*, 24 F. Cas at 339.  Both their opinions support the *Jones* framework.

The first to address the 1866 Act was Justice Noah Swayne, the first Justice that President Lincoln appointed to the Supreme Court.  William D. Bader & Frank J. Williams, *David Davis: Lawyer, Judge, and Politician in the Age of Lincoln*, 14 ROGER WILLIAMS U. L. REV. 163, 185 (2009).  Riding circuit in Kentucky, he heard *United States v. Rhodes*.  There, a state court denied a Black woman the right to testify against the four white men who attacked her and burglarized her home. *Rhodes*, 27 F. Cas. at 785–86.  The defendants argued that their indictment was "fatally defective" because the Civil Rights Act of 1866, under which they were charged, was "unconstitutional and void." *Id.* at 785.

Justice Swayne disagreed.  He offered a thorough account of how the Thirteenth Amendment transformed our Constitution and broadly empowered Congress.  He explained that before Reconstruction, the Founders "saw many perils of evil in the center [of government], but none elsewhere." *Id.* at 788.  "They feared tyranny in the head, not anarchy in the" states. *Id.* So particularly with the first eleven amendments, he observed, the Constitution preserved the rights of the states from federal encroachment. *Id.*

But the Thirteenth Amendment marked a departure from those protections for states.  Justice Swayne noted that amendment came after the "throes and convulsions of a civil war." *Id.* And the conflict that set the stage for the amendment laid bare the need to

protect against state efforts to preserve slavery. So, Justice Swayne explained, the Framers "sought security against the recurrence of a sectional conflict." *Id.* In doing so, they were "impelled by a sense of right and by a strong sense of justice . . . ." *Id.* For the first time in American history, the American people ratified an amendment, which "trenche[d] directly upon the power of the states and of the people of the states." *Id.*

Against this backdrop, Justice Swayne understood that courts had to be deferential to an empowered Congress exercising Section 2 authority. Or, he thought, courts needed to be at least as deferential as they had been to the use of other powers under the lenient *McCulloch* test. Justice Swayne quoted at length from *McCulloch*. *Id.* at 791. And he noted that "Chief Justice Marshall used the phrase 'appropriate' as the equivalent and exponent of 'necessary and proper' . . . ." *Id.* Then Justice Swayne cited Justice Story's interpretation of *McCulloch*. *Id.* at 792. For his part, Justice Story, the author of *Prigg*, 41 U.S. at 608, saw Congress as having "a wide discretion" and "considerable latitude" to choose "appropriate" means because the connection between means and ends "is not always so direct and palpable as to strike the eye of every observer." *Rhodes*, 27 F. Cas. at 792.

In fact, Justice Swayne concluded that "an act of congress is not to be pronounced unconstitutional unless the defect of power to pass it is so clear as to admit of no doubt." *Id.* at 793. That's so, he reasoned, because "[a] remedial power in the constitution is to be construed liberally." *Id.* (quoting *Chisholm v. Georgia*, 2 U.S. (2

22-13822            ROSENBAUM, J., Concurring            23

Dall.) 419, 476 (1793)).  And he recognized that the Supreme Court up until that point had only three times invalidated acts of Congress.[5]  *Id.*

Applying this liberal standard to the Thirteenth Amendment, Justice Swayne upheld the constitutionality of the Civil Rights Act.  *Id.* at 794.  He first noted the wide expanse of the Thirteenth Amendment, which protects people of "every race, color, and condition" against present and "the recurrence" of slavery "without limit of time or space."  *Id.* at 793.  And Section 2, "employ[ing] a phrase which had been enlightened by well-considered judicial application" in *McCulloch*, allowed Congress to select "appropriate" means that courts could strike down only "when the authority given has been clearly exceeded . . . ."  *Id.*

The Civil Rights Act easily cleared this low bar.  The Thirteenth Amendment allowed Congress to address badges and incidents of slavery like those that the 1866 Act targeted.  *See id.* at 793–94. Otherwise, the emancipation "would have been a phantom of delusion."  *Id.*  Justice Swayne explained that without Congress's ability to correct badges and incidents of slavery, "[l]egislative oppression would have been increased in severity," and "[u]nder the guise of police and other regulations slavery would have been in

---

[5] Those three decisions were *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), *Dred Scott*, 60 U.S. 393, and *Ex parte Garland*, 71 U.S. (4 Wall.) 334 (1866).  But *Marbury* was decided before *McCulloch*, and *Ex Parte Garland* issued after the ratification of the Thirteenth Amendment.  So the universally disparaged *Dred Scott* was the only antebellum decision where the Court arguably found a statute failed the *McCulloch* test.

effect restored . . . ." *Id.* So, Justice Swayne pointed out, Section 2 "was intended to give expressly to congress the requisite authority . . . ." to prevent that result. *Id.* And, he held, the Civil Rights Act was an appropriate exercise of that broad authority.

Justice Swayne's decision in *Rhodes* was not an anomaly. As he himself noted, it was consistent with the contemporary opinions of the Indiana Supreme Court and the chief justice of the Court of Appeals of Maryland. *Id*; *see also Smith v. Moody*, 26 Ind. 299 (Ind. 1866); *The Civil Rights Bill. Important Judicial Decision by Justice Bowie*, N.Y. TIMES, July 7, 1866, at 5; *but see Rhodes*, 27 F. Cas. at 794 (noting that Justice Swayne's decision departed from the court of appeals in Kentucky). Not only that, but the Chief Justice of the Supreme Court, riding circuit, also came to the same conclusion.

In *In re Turner*, Chief Justice Salmon P. Chase heard the case of a former slave whose former master had made her an apprentice to be a house servant. 24 F. Cas. at 339. She alleged that this apprenticeship was a form of "involuntary servitude" that violated the Thirteenth Amendment and the Civil Rights Act. *Id.* Chief Justice Chase was brief but clear in agreeing with her. He upheld the Civil Rights Act as "constitutional" under Section 2 of the Thirteenth Amendment. *Id.*

Although Chief Justice Chase declined to state the "grounds" for his decision, the winning advocate argued that "Congress is itself the judge of its power to pass such a law, and is alone the judge of the existing necessity for it." *Id.* That is, the winning

22-13822          ROSENBAUM, J., Concurring          25

advocate expressly relied on *McCulloch* for his position. *Id.* And evidently, the Chief Justice found his position convincing.

The point here is that both Congress and the Judiciary understood that Section 2 constitutionalized the *McCulloch* standard for Thirteenth Amendment legislation. And *Jones* fits squarely within that framework.

### IV. Later Supreme Court opinions do not justify a departure from *Jones*.

Despite the textual and historical support for *Jones*, Leahy asks us to abandon the decision. Instead, he advocates for a standard of review that the *Civil Rights Cases*, 109 U.S. 3, would have set. The *Civil Rights Cases* consisted of a group of five cases that the Supreme Court decided soon after Reconstruction ended. And it prevented Congress from addressing some of the worst excesses of Jim Crow.

Leahy also claims support from the Supreme Court's recent decisions interpreting Congress's authority under Sections 5 and 2 of the Fourteenth and Fifteenth Amendments, respectively. *See City of Boerne v. Flores*, 521 U.S. 507 (1997); *Shelby County v. Holder*, 570 U.S. 529 (2013). Like Section 2 of the Thirteenth Amendment, those provisions grant Congress the authority to enact "appropriate legislation" to enforce their Amendments. *See* U.S. CONST. amends. XIV, § 5; XV, § 2.

But *Jones* severely cabined the *Civil Rights Cases*'s Thirteenth Amendment jurisprudence. *See Jones*, 392 U.S. at 441 n.78. And the Supreme Court has never repudiated *Jones*. Plus, *Jones*, unlike the

Court's more restrictive decisions on the Fourteenth and Fifteenth Amendments, directly addresses the Thirteenth Amendment. So it is more relevant here. It also better captures the text and history of the Thirteenth Amendment than would a new test imported from recent decisions on the Fourteenth and Fifteenth Amendments. To show why, I review the history of the Court's Reconstruction amendments caselaw. I begin with the pro-segregationist *Civil Rights Cases*. Then I move to the mid-twentieth century shift in that caselaw, which brought us *Jones*. And finally, I conclude with more recent decisions curtailing Congress's authority under the Fourteenth and Fifteenth Amendments.

### A. *The* Civil Rights Cases

The *Civil Rights Cases* considered the constitutionality of the Civil Rights Act of 1875 ("1875 Act"). *Civil Right Cases*, 109 U.S. at 4. That law prohibited private discrimination at "inns, public conveyances . . . , theaters, and other places of public amusement . . . ." *Id.* at 9. And the Court assessed Congress's authority to enact the Act as "appropriate legislation" to enforce both the Thirteenth and Fourteenth Amendments. *Id.* at 25. But the Court struck down the statute as exceeding those powers. *Id.*

This was the Supreme Court's first articulation of the scope of Congress's authority under the Thirteenth Amendment. But it's of limited historical value. Decided in 1883, the Court wrote its opinion after the federal government had abandoned Reconstruction. Marianne L. Engelman Lado, *A Question of Justice: African-American Legal Perspectives on the 1883 Civil Rights Cases*, 70 CHI.-

22-13822                ROSENBAUM, J., Concurring                27

KENT L. REV. 1123, 1124 (1995). By then, few Black Americans sued under the Civil Rights Act of 1875 because of a low likelihood of success in the federal courts and fear of white retaliation. *Id.* As one contemporaneous columnist wrote, "The Civil Rights bill lingered unconsciously nearly nine years and died on the 15th of October, 1883, without a struggle." *Id.* at 1125 (quoting *Xenia—Numerous Notes—Politics—Civil Rights*, CLEV. GAZETTE, Oct. 27, 1883, at 2).

Still, Americans—both Black and non-Black—met the decision with shock and condemnation. One paper, for example, *The New York Globe*, was "flooded" with complaints about the decision and described itself as "paralyzed by the abundance of strong, manly protests and apprehension for the future which ha[d] reached [it] in the form of correspondence . . . ." *Id.* at 1149 (quoting N.Y. GLOBE, Nov. 3, 1883, at 2). The *Globe* had to apologize for its inability to publish all the letters it received. *Id.* Another paper, the *Detroit Plaindealer*, reported that the "[t]he decision . . . cause[d] almost universal disapproval of the people, both white and colored, in Detroit. It still remain[ed] an insult to the memory of Lincoln, who freed this race, and to Sumner who introduced the bill." *Id.* at 1171–72 (quoting *Civil Rights: Opinions of the Press*, ARK. MANSION, Nov. 3, 1883, at 1).

They were not alone in noticing the uproar—especially among Black Americans, who gathered in cities across the country to commiserate over the decision. *Id.* at 1129–30. Frederick Douglass described the decision as "one more shocking

development of that moral weakness in high places which has attended the conflict between the spirit of liberty and the spirit of slavery from the beginning . . . ." *Id.* at 1136 (quoting Frederick Douglass, The Civil Rights Case, Speech at the Civil Rights Mass Meeting Held at Lincoln Hall in Washington, D.C. (Oct. 22, 1883), *in* NEGRO SOCIAL AND POLITICAL THOUGHT 1850-1920: REPRESENTATIVE TEXTS 298 (Howard Brotz ed., 1966)). He believed the opinion to be a "sudden and causeless reversal of all the great rules of legal interpretation by which [the Supreme] Court was governed in other days." *Id.* at 1137 (quoting Douglass, the Civil Rights Case, *supra*, at 303).

The historical record shows Douglass was right. In effect, the *Civil Rights Cases* applied a heightened scrutiny to the 1875 Act. And that marked a blatant departure from the lenient standard in *McCulloch*, which had governed the review of antebellum Congresses' legislation. Because the *Civil Rights Cases* employed that changed standard, the Court struck down the 1875 Act as unauthorized by the Thirteenth Amendment.

The Court's reasoning began similarly enough to *Jones*'s. Indeed, the Court recognized that the Thirteenth Amendment "clothe[d] Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States . . . ." *Civil Rights Cases*, 109 U.S. at 20.

But then the Court departed from the historical record. The Court determined those badges to be a limited list, which the Court had "very distinct notions of . . . ." *See id.* at 22.

The Court said they consisted of not much more than "[c]ompulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities . . . ." *Id.*

But in the Court's view, "Congress did not assume . . . to adjust what may be called the social rights of men and races in the community; but only to declare and vindicate those fundamental rights which appertain to the essence of citizenship . . . ." *Id.* Applying this reasoning, the Court defined fundamental rights very narrowly. Indeed, the Court thought Congress could not use the Thirteenth Amendment to prohibit "the taking of private property without due process of law; or allowing persons who have committed certain crimes . . . to be seized and hung . . . without regular trial; or denying to any person, or class of persons, the right to pursue any peaceful avocations allowed to others." *Id.* at 23–24.

And the Court concluded that racial discrimination in places of public accommodations—which the 1875 Act prohibited— "ha[d] nothing to do with slavery or involuntary servitude . . . ." *Id.* at 24. As the Court saw things, "[m]ere discriminations on account of race or color were not regarded as badges of slavery." *Id.* at 25.

But holes riddle the *Civil Rights Cases*'s Thirteenth Amendment analysis. To start, although the Court recognized that Congress could legislate to eliminate badges and incidents of slavery, it ahistorically imagined that Congress envisioned these badges to be

minimal. *See id*. at 22. As I've discussed, though, while the Framers agreed on a baseline of prohibited conduct under the Thirteenth Amendment, they designed the amendment so Congress could legislate to eliminate further acts of discrimination of an unspecified scope. Indeed, that's the whole purpose of Section 2. The Thirteenth Amendment prohibits some deprivations outright but lets Congress attack even more it rationally identifies contribute to slavery.

We can understand the faults in the Court's reasoning even more when we look at what it considered *not* to be incidents of slavery. Consider the Court's highlighting of the "taking of property without due process of law" as not falling within badges of slavery. *See id*. at 23. At the same time, the Court acknowledged, as it had to, that the inability to "hold" and "convey" property is a badge of slavery. *See id* at 22. But how would a freed slave be able to exercise their equal property rights if Congress could not prohibit the lawless taking of their property? Equal property rights would be illusory.

Similarly, the Court recognized that freed slaves must be able to "give evidence" in court. *See id*. Yet it thought they could be "hung . . . without regular trial." What worth is evidence if a Black person could be hanged without a trial? *See id*.

As for the Court's determination that Congress could not prohibit racial discrimination in public accommodations, *id*. at 24, that decision excused nearly a century of segregation where states treated Black Americans as inferior. Through the *Civil Rights Cases*,

the Court, in fact, transformed the Thirteenth Amendment into "a mere paper guarantee." *See* CONG. GLOBE, 39th Cong., 1st Sess. 1151 (1866) (statement of Rep. Thayer).

And in doing so, the Court fundamentally ignored its precedent and that precedent's influence on the Thirteenth Amendment. Trumbull and the Framers understood that under the *McCulloch* standard, Congress enjoyed wide discretion to enact "appropriate legislation." But the Court established new rules in the *Civil Rights Cases*. It reviewed Congress's work without the deference it had traditionally afforded the Article I branch. *See id*. at 24–25. Put simply, nearly all the Justices signed off on an opinion that shifted the goalposts after Congress already took its shot.

Except one Justice. "Justice Harlan knew better." *Students for Fair Admissions*, 600 U.S. at 230. Harlan, who denounced segregation in *Plessy v. Ferguson*, 163 U.S. 537 (1896), did not get his nickname the "Great Dissenter" by dissenting only once. His second most famous dissent is in the *Civil Rights Cases*. There, he gave a comprehensive explanation of Congress's broad authority under both the Thirteenth and Fourteenth Amendments of the Constitution.

Justice Harlan's opinion was a precursor to *Jones*. It noted that the Thirteenth Amendment authorized Congress to pass "legislation . . . for the eradication, not simply of the institution [of slavery], but of its badges and incidents . . . . " *Id.* at 35 (Harlan, J., dissenting). Congress, he said, "had the power . . . to protect the freedom established, and consequently to secure the enjoyment of

such civil rights as were fundamental in freedom." *Id.* And, he explained, the courts should assess that power under the traditionally lenient standard of review that it had always used in cases like *McCulloch* and *Prigg. See id.*; *cf. id.* at 51–53 (explaining the traditionally deferential standard of review under *McCulloch* in the context of Congress's power under the Fourteenth Amendment).

To Harlan, the Civil Rights Act of 1866 was obviously a constitutional exercise of Congress's power. And just as obviously, the Civil Rights Act of 1875 was constitutional because "discrimination practised by [public accommodations] in the exercise of their public or quasi-public functions is a badge of servitude . . . ." *Id.* at 43. At bottom, Justice Harlan reasoned, although Congress can't use the Thirteenth Amendment to "regulate the entire body of the civil rights which citizens enjoy, . . . . [it] may enact laws to protect . . . people against the deprivation, *on account of their race*, of any civil rights enjoyed by other freemen . . . ." *Id.* at 36. That's so because "slavery . . . was the moving or principal cause of the [Thirteenth Amendment], and . . . rested wholly upon the inferiority, as a race, of those held in bondage . . . ." *Id* (internal citations omitted). Justice Harlan was the only member of a pro-segregationist Court that understood and supported the Framers' vision. And it's his opinion, not the majority's, that has survived the scrutiny of history.

### B. The Return to the McCulloch Standard

It took more than 80 years for Harlan's view to prevail at the Supreme Court. But it eventually became the law of the land as

22-13822          Rosenbaum, J., Concurring          33

Congress and the Court dismantled Jim Crow.  In 1964, Congress repassed the protections of the 1875 Act as Title II of the Civil Rights Act of 1964.  *See* Civil Rights Act of 1964, Pub. L. No. 88-352, §§ 201–07, 78 Stat. 241, 243–46.  This time, the Supreme Court upheld it as a valid exercise of the Commerce Clause.  *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 305 (1964).  And one Justice would have overruled the *Civil Rights Cases*.  *See Heart of Atlanta Motel*, 379 U.S. at 280 (Douglas, J., concurring).

Then, in 1968, the Court decided *Jones*.  In *Jones*, the Court abandoned the *Civil Rights Cases*'s Thirteenth Amendment analysis.  *See Jones*, 392 U.S. at 441 n.78.  True, the Court didn't formally overrule the decision.  But by that point, any questions about the constitutionality of the 1875 Act had been "rendered largely academic by . . . the Civil Rights Act of 1964 . . . ."  *Id.*

And in any case, the Court severely narrowed the *Civil Rights Cases* to stand for a limited principle:  The Thirteenth Amendment "authorizes Congress not only to outlaw all forms of slavery and involuntary servitude but also to eradicate the last vestiges and incidents of a society half slave and half free by securing to all citizens, of every race and color, 'the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens.'"[6]

---

[6] The Court also expressly overruled a successor case to the *Civil Rights Cases*, which adopted an even more restrictive standard of review of Thirteenth

*Id*. (quoting *Civil Rights Cases*, 109 U.S. at 22 (Harlan, J., dissenting)). The Court reaffirmed *Jones* in the few Thirteenth Amendment cases that came before it, showing that its test was here to stay. *See Runyon v. McCrary*, 427 U.S. 160, 179 (1976); *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 172 (1989) (reaffirming *Runyon*).

*Jones* is just one piece of the Court's return to its *McCulloch*-standard roots for civil-rights legislation. At one point, a unanimous Court expressed doubt not just about the *Civil Rights Cases's* Thirteenth Amendment holding but its Fourteenth Amendment holding as well. *See United States v. Guest*, 383 U.S. 745, 782–83 (1966) (Brennan, J., concurring in part & dissenting in part); *id*. at 762 (Clark, J., concurring) (repudiating the Fourteenth Amendment holding of the *Civil Rights Cases* in response to Justice Brennan); *District of Columbia v. Carter*, 409 U.S. 418, 424 n.8 (1973) (adopting, in dicta, Justices Brennan and Clark's opinions in *Guest*); *but see United States v. Morrison*, 529 U.S. 598, 624 (2000) (reaffirming that the *Civil Rights Cases's* Fourteenth Amendment holding remains good law despite *Guest* and *Carter*). And the Court abandoned restrictive readings of Congress's authority to enact Fourteenth and Fifteenth Amendment legislation.

For example, in *South Carolina v. Katzenbach*, 383 U.S. 301, 327–37 (1966), the Court upheld provisions of the Voting Rights Act under the Fifteenth Amendment. The Fifteenth Amendment

---

Amendment legislation. *See Jones*, 392 U.S. at 441 n.78 (citing *Hodges v. United States*, 203 U.S. 1 (1906)).

prohibits restrictions on the right to vote because of race. And like the Thirteenth Amendment, Congress may enforce it by "appropriate legislation." *See* U.S. CONST. amend XV, § 2. Reviewing the Voting Rights Act, the Court used "Chief Justice Marshall['s] . . . classic formulation . . . " (*McCulloch*). *South Carolina*, 383 U.S. at 326. And it reconfirmed the meaning of "appropriate legislation": "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *Id.* at 324.

In *South Carolina*, the Court confirmed that the Reconstruction Amendments authorized legislation that "prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *Boerne*, 521 U.S. at 518 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)). It did so when it upheld a ban on voter literacy tests even though the Court had previously held that using literacy tests was not always unconstitutional. *South Carolina*, 383 U.S. at 333–34 (discussing *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45 (1959)).

Similarly, in *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966), the Court applied "the *McCulloch v. Maryland* standard" to uphold another provision of the Voting Rights Act as "appropriate"—this time against a challenge that Congress exceeded its authority to enforce the Equal Protection Clause of the Fourteenth Amendment. The Court explained that Section 5 of that amendment "is a positive grant of legislative power authorizing Congress to exercise its

discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Id.*

In sum, through the second half of the twentieth century, the Court interpreted the exercise of Congress's authority under the Reconstruction amendments in line with *McCulloch* and, therefore, their original public meaning.

### *C.* City of Boerne v. Flores *and* Shelby County v. Holder

But, as Leahy points out, in a pair of cases in 1997 and 2013, the Supreme Court rolled back the *McCulloch* standard of review for Fourteenth and Fifteenth Amendment legislation. *See Boerne*, 521 U.S. 507; *Shelby County*, 570 U.S. 529. Still, these cases, which never mention and don't apply to the Thirteenth Amendment, offer unpersuasive grounds for departing from *Jones*. Before I explain, I begin by summarizing their holdings.

First, the Court decided *City of Boerne v. Flores*. In that case, the city of Boerne, Texas, challenged the Religious Freedom Restoration Act of 1993 ("RFRA"), Pub. L. No. 103–141, 107 Stat. 1488. That federal law mandates that, before states abridge religious freedom, they must comply with a stricter standard than the one the Supreme Court recognized the Free Exercise Clause imposes. *Boerne*, 521 U.S. at 511–16 (discussing how Congress enacted RFRA in response to *Employment Division Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)). After review, the Court held the Act, as applied to the states, unconstitutionally exceeded Congress's authority under Section 5 of the Fourteenth Amendment. *Boerne*, 521 U.S. at 511.

The Court announced moving forward that it would adopt a more stringent test to review Congress's chosen "means" to enforce the Fourteenth Amendment. Under that approach, legislation under Section 5 of the Fourteenth Amendment must be "congruen[t] and proportional[] between the injury to be prevented or remedied and the means adopted to that end." *Boerne*, 521 U.S. at 520. That differed from the *McCulloch* standard, which, of course, required only that, so long as Fourteenth Amendment legislation had legitimate ends, "all means which are appropriate" were permissible. *See McCulloch*, 17 U.S. at 421. The change to only "congruent[] and proportional[]" means represented a departure from the Framers' vision as the historical record reveals it. *See* Engel, *The McCulloch Theory*, *supra*. In fact, the Court did not even cite *McCulloch*.[7] *See generally Boerne*, 521 U.S. 507.

Then, in 2013, the Court decided *Shelby County v. Holder*. *Shelby County* centered on a challenge to § 5 of the Voting Rights Act of 1965. The suit asserted that the legislation was not "appropriate" under the Fifteenth Amendment. *See Shelby County*, 570 U.S. at 535. Section 5 of the Voting Rights Act required in certain states and counties that "no change in voting procedures could take effect until it was approved by federal authorities in Washington, D.C.—

---

[7] The Court did recognize as binding on its decision caselaw that applies the *McCulloch* standard. *See Boerne*, 521 U.S. at 517–18 (discussing *South Carolina v. Katzenbach* and *Katzenbach v. Morgan*). But it also relied on the *Civil Rights Cases* for its reasoning, which in its own right starkly departed from *McCulloch*. *See id*. at 524–25.

either the Attorney General or a court of three judges." *Id.* at 537. This requirement applied to those jurisdictions that had a voter test and less than 50% voter turnout or registration as of the 1964, 1968, and 1972 elections. *Id.* at 537–39. Congress identified these circumstances as a proxy for jurisdictions that had committed some of the worst excesses of Jim Crow. *See id.* at 552. We refer to those criteria as the Court did in *Shelby County*, *see generally id.*, as the Voting Rights Act's "coverage formula."

The Court held the coverage formula exceeded Congress's power under Section 2 of the Fifteenth Amendment. *Id.* at 557. Still, the Court "issue[d] no holding on § 5 [of the Voting Rights Act] itself . . . ." *Id.* Rather, the Court explained, the coverage formula, based on decades-old data, was inappropriate because Fifteenth Amendment legislation must "speak[] to current conditions." *Id.* And that was especially so in the case of the coverage formula, the Court reasoned, because states have "equal sovereignty." *Id.* at 544. Yet by treating certain states differently, the Court said, the coverage formula marked an "extraordinary departure from the traditional course of relations between the States and the Federal Government." *Id.* at 545 (quoting *Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491, 500–01 (1992)).

Leahy points to these restrictions on the other two Reconstruction Amendments and urges us to adopt a more scrutinizing

review of Thirteenth Amendment statutes.  But though the Reconstruction amendments are siblings, they are not identical triplets.[8]

*Jones* governs the unique context of the Thirteenth Amendment.  And *Boerne* and *Shelby County* stay in their own lanes.  Indeed, the majority opinion in *Shelby County* never cited *Boerne* nor extended the "congruence and proportionality" test to the Fifteenth Amendment.  *Cf. Allen v. Milligan*, 599 U.S. 1, 41 (2023) (assessing the scope of Congress's Fifteenth Amendment authority without applying the congruence-and-proportionality test); *but see id.* at 80 n.19 (Thomas, J., dissenting) ("While our congruence-and-proportionality cases have focused primarily on the Fourteenth Amendment, they make clear that the same principles govern 'Congress' parallel power to enforce the provisions of the Fifteenth Amendment.'") (quoting *Boerne*, 521 U.S. at 518).

And though *Boerne* established a framework for Fourteenth Amendment legislation, *Shelby County* doesn't offer an easily generalizable test beyond the dispute there.  *Cf. id.* at 41 (evaluating Congress's authority under the Fifteenth Amendment with no reference to *Shelby County*).  The Court's decision grew out of the unique facts before it.  *See Shelby County*, 570 U.S. at 535, 557.  In particular, the Court thought the preclearance regime based on the

---

[8] Even the *Civil Rights Cases* Court understood the amendments have marked differences.  *See Civil Rights Cases*, 109 U.S. at 23 ("The [Thirteenth and Fourteenth] amendments are different, and the powers of Congress under them are different.  What Congress has power to do under one, it may not have power to do under the other.").

coverage formula *at the time* was an unconstitutional exercise of Congress's authority. *Id.* at 557. But the Court expressly refused to hold that a preclearance system based on current data would violate the Fifteenth Amendment. *Id.* Nor did the Court cast doubt on any other part of the Voting Rights Act. *Id*; *cf. Allen*, 599 U.S. at 41 (upholding § 2 of the Voting Rights Act as applied to redistricting as a lawful exercise of Congress's Fifteenth Amendment authority).

The Court has similarly not extended the congruence-and-proportionality test (or any doctrinal framework that could be discerned from *Shelby County*) to the Thirteenth Amendment. And it has a very good reason for not having done so: Thirteenth Amendment legislation does not threaten federalism in the same way the Court believes Fourteenth and Fifteenth Amendment legislation does.

In *Boerne* and *Shelby County*, the Court expressed concerns, not present when it comes to Thirteenth Amendment legislation, about threats to the "federal balance" between state sovereignty and federal power. *Boerne*, 521 U.S. at 536. In *Boerne*, for instance, the Court said that Congress couldn't "decree the substance of the Fourteenth Amendment's restrictions on the *States*." *Id.* at 519 (emphasis added). In support, the Court cited history it said showed that the Framers carefully tailored the Fourteenth Amendment to not grant too much power to interfere with the domain of the states. *Id.* at 520–24; *but see* Engel, *The McCulloch Theory*, *supra*. Similarly, in *Shelby County*, the Court found the Voting Rights Act's preclearance system to be "a drastic departure from basic

22-13822            ROSENBAUM, J., Concurring            41

principles of federalism." *Shelby County*, 570 U.S. at 535. And the Court found it troubling that the "requirement [applied] only to some States—an equally dramatic departure from the principle that all States enjoy equal sovereignty." *Id.*

These concerns don't exist for the Thirteenth Amendment. The Fourteenth Amendment authorizes Congress to enact legislation to enforce the prohibition on *states'* abridgment of the privileges or immunities of citizenship, denial of due process of law, and denial of equal protection of the laws. U.S. CONST. amend XIV, §§ 1 & 5. And the Fifteenth Amendment allows statutes that prevent *states* from denying the right to vote because of race. *Id.* amend. XV. Both Amendments expressly call for Congress to zero in on the conduct of *states*.

By contrast, the Thirteenth Amendment includes no specific focus on the states. Rather, the amendment allows for legislation that eliminates all vestiges of slavery throughout the United States—whether by the federal government, the states, or private individuals. U.S. CONST. amend XIII. So in that way, the Thirteenth Amendment doesn't differ from the rest of Congress's powers. *See id.* art. I, § 8. Congress can prohibit all Americans from perpetuating "badges and incidents of slavery"—just as it can prohibit counterfeit money, the transport of prohibited goods in interstate commerce, or interference with the postal system. *See id.*

Indeed, in this very case, Leahy faces criminal charges no more intrusive on the states than any other federal criminal statute. *See* 18 U.S.C. § 245(b)(2)(B). And the statute under which he is

42                    ROSENBAUM, J., Concurring                    22-13822

charged, like other Thirteenth Amendment legislation, applies equally across the United States. *See id.*; *cf.* 42 U.S.C. §§ 1981, 1982 & 1985(3) (legislation upheld as valid exercises of Congress's Thirteenth Amendment authority in *Jones*, *Runyon,* and *Griffin*).

True, as Justice Swayne noted in *Rhodes*, the Thirteenth Amendment marked a shift in the Constitution, where for the first time, it "trenche[d] directly upon the power of the states . . . ." *Rhodes*, 27 F. Cas. at 788. But that was because before the Civil War, the Constitution strengthened slavery in the states. *See* AMAR, AMERICA'S CONSTITUTION, *supra*, at 20–21. And the Thirteenth Amendment entirely removed any state's right to uphold that institution. U.S. CONST. amend. XIII. So though the Thirteenth Amendment itself stripped states of power, legislation enacted under the amendment does not interfere with anything in the states' rightful domain.

Put simply, states have no authority to enact pro-slavery legislation. But that's not true for the subject matter of the Fourteenth and Fifteenth Amendments, which authorize congressional regulation in areas where the states may still exercise significant power. [9]

---

[9] To avoid any suggestion that Congress could use the Thirteenth Amendment as a pretext to legislate on matters unrelated to slavery, I emphasize that Congress must act "*rationally* to determine" the conduct it targets is a "badge[] or . . . incident[] . . . ." *See Jones*, 392 U.S. at 440 (emphasis added). We have not been afraid to hold that certain conduct could not be rationally thought to be a "badge or incident of slavery." *See Arnold v. Bd. of Educ of Escambia Cnty.*, 880 F.2d 305, 315 (11th Cir. 1989) ("While the thirteenth amendment has been broadened [by *Jones*] to prohibit a wider range of conduct, it clearly does not

22-13822          ROSENBAUM, J., Concurring          43

*See*, *e.g., Georgia v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) ("The states are responsible for enacting 'a complete code for . . . elections,' including 'regulations relati[ng] to . . . prevention of fraud and corrupt practices [and] counting of votes.'") (alterations in original) (quoting *Moore v. Harper*, 60 U.S. 1, 29 (2023)).

Still, Leahy emphasizes that all three amendments, ratified in close succession, authorize Congress to "enforce" them "by appropriate legislation." Yet the Court has subjected only two to more scrutinizing review.

And to be sure, there's some inherent appeal to applying the same meaning of "by appropriate legislation" to all three amendments. But as I've explained, the rest of the text of the amendments differs. And more importantly, the history of the Thirteenth Amendment simply doesn't support extending any standards the Court adopted for the Fourteenth and Fifteenth Amendments in *Boerne* and *Shelby County*, respectively. So being faithful to the text and the origins of the Thirteenth Amendment requires us to apply the *Jones* standard, which applies the *McCulloch* standard.

**V. Conclusion**

In our over 200-year history, the federal judiciary has developed the wisdom that "[d]ue respect for [the legislative branch] demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional

---

encompass a situation where an individual is paid for services willingly performed.").

44                    ROSENBAUM, J., Concurring                    22-13822

bounds." *Morrison*, 529 U.S. at 607.  For most of our first century, we abided by that principle.  But as the nation careened towards civil war, we departed from this path and issued *Dred Scott*, which invalidated a statute barring slavery in federal territory.  Recognizing how, in that critical moment, the halls of justice perpetuated injustice, the Framers of the Thirteenth Amendment provided Congress with a broad grant of independent authority to eliminate slavery, including all its vestiges.  We must honor their choice, and we do, by faithfully applying *Jones*.